THE IOLA PORTLAND CEMENT COMPANY v. ROBERT B. MOORE.

No. 12,786.     (70 Pac. 864.)

SYLLABUS BY THE COURT.

1. RAILROADS — *Injury to Employee — Liability of Owner of Tracks.* The owner of railway-tracks who has given up their use to a brick company and a railway company for the purpose of switching cars, and who, without notice, erects a dangerous obstruction to the use of the tracks for such purpose, is liable to a member of a train crew of the railway company who, while in the discharge of his duty, and in ignorance of his danger, sustains injury occasioned by such obstruction.

2. ——— *Duty of Railway Brakeman.* A railway brakeman is required to observe all dangers threatened by any structure connected with or incident to the use of the track for railway purposes; but he is not bound to an anticipation of any impediment not involved in, or relating to, the operation of the road, of which he is actually ignorant.

Error from Allen district court; L. STILLWELL, judge. Opinion filed December 6, 1902. Affirmed.

STATEMENT.

ROBERT B. MOORE commenced an action in the district court of Allen county against the Iola Portland Cement Company to recover damages for personal in-

juries. The cement company. was the owner and operator of a plant for the manufacture of cement near the city of Iola. For its own accommodation, it constructed and maintained certain railway-tracks from a point at the south to a point at the north of its buildings, and running near to them. The Atchison, Topeka & Santa Fe Railway Company built a spur from its line of road through the city of Iola northward to the cement company's yards, and connected it with the south end of the cement company's tracks. On the west side of the cement works were two tracks, the outer one being a loop from the one next to the buildings, starting at a point south and ending at a point north of the cement plant. Beyond the loop, the track running nearest the buildings extended a considerable distance to an establishment for the manufacture and shipment of brick owned and operated by the Star Brick Company. The west track and the brick-plant extension were given up by the cement company to the railway company and the brick company, for use in the latter's business. The railway company did the switching of cars for both manufacturing establishments upon switching orders left with the station agent at Iola. Referring to the use of the tracks by the brick company and the railway company, the superintendent of the cement company testified, as follows :

" Ques. Who operated that track and loaded brick onto these cars ? Ans. The Star Brick Company. We gave that track up to them.

" Q. . . . The business of the brick plant was running backwards and forwards over your track ; that was done with your consent ? A. Yes, sir.

" Q. . . . Then you knew most any day they would be liable to come there for a load of brick or set cars there ; you knew that? A. We did n't know when they would be ordered.

"Q. Who gave consent, or by whose consent were they permitted to run in cars down there? A. We let them run down to accommodate the railroad company and the Star Brick Company."

At the time of the accident complained of, the cement company was engaged in the construction of a warehouse adjoining and extending north from its buildings previously erected. To facilitate the handling of heavy building material, it erected a gin-pole, with block and tackle attached, on the inside of the new structure, and secured it by guy-ropes attached near its top and extending slantingly over the tracks described to the earth, some distance west of them. On October 22, 1900, the railway company sent a train of cars into the yards described with switching orders from both the brick company and the cement company. The train crew consisted of an engineer and fireman, a swing man and two brakemen, the conductor having remained at the station in Iola. The swing man had charge of the switch lists and directed all the work. The engine headed north, with the cars of the train, some thirteen in number, in front of it. It was the purpose to push the five northerly cars over the loop track, cut them off, and allow them to run down to the brick plant, to be loaded with brick. The cement company had no interest in this operation. The swing man was to cut off the cars and give the necessary signals. One brakeman was stationed on top of the cars, near the engine, for the purpose of reporting signals, and the other brakeman, Moore, the plaintiff below, was required to ride the cars and to control them with the brake.

With the train going at the rate of four or five miles per hour, Moore climbed the north end of the north car for the purpose of performing the duties imme-

diately required of him.   The brake being at the south
end of the car, he walked south the length of the car
to the brake, took hold of it to set it, and while in a
stooping position over the brake, with his face toward
the engine, the car passed under the guy-rope, which
caught him behind and just below the knees and threw
him over to the next car, occasioning him much phys-
ical injury.   The day was dark.   It was raining at
the time, and the testimony is conflicting as to how far
the rope could be seen before it was put in vibration
by the stroke.   It is disputed whether or not Moore
could have seen the rope at the time he mounted the
car, if he had looked.   Moore said that he could not
have seen it in the rain.

The engineer, the swing man, the front brakeman,
Moore himself, the conductor, and the station agent
all testified positively that no notice, knowledge or
information whatever of the extension of the guy-rope
over the track had ever been communicated to them
previous to the injury.   The fireman was not called,
but it is not contended that he knew anything of the
obstruction.   The evidence is clear that whatever
Moore did in placing himself in position to handle the
cars was proper.   Concerning his omissions, if any,
he testified upon cross-examination as follows :

"Ques.  Now, Mr. Moore, with your experience as a
brakeman and observation, what would you say, Is it
the duty of every one in charge of or working upon
a train of cars to keep a lookout for all matters that
may impede or injure persons upon that train ?  Ans.
Yes, sir, it is.   Of course it would be a poor man
that would allow his fellow workmen to get into a
trap. . . .

"Q.  If you were on the top of this car when it
started in, to go in, what was there to have prevented
you from seeing this guy-rope which was there ? . A.

Cement Co. v. Moore.

A man ain't got four eyes; he can't see behind him. I had to get up there and set that brake.

"Q. Did you look ahead? A. I got up on the car, I went right to the brake as fast as I could go; that was my business, to go to the brake as fast as I could. I didn't have time to look until I got that brake set.

. . .

"Q. Did you look to see any (referring to the guy-rope and gin-pole)? A. No; I didn't have to look to see them.

"Q. Did you look? A. I didn't look for them. No, sir."

A verdict was returned for the plaintiff, on which judgment was entered. The cement company then commenced this proceeding in error, and complains chiefly of the sufficiency of the evidence to warrant the action of the jury and of the court below.

*Oscar Foust & Son*, and *Baxter D. McClain*, for plaintiff in error.

*C. A. Cox*, and *J. B. Atchison*, for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The record in this case presents but two questions for determination: (1) The extent of the duty of the cement company to Moore; and (2) whether Moore was himself free from such fault as would preclude recovery.

It is wholly unnecessary to enter upon any discussion of the duties of a landowner to one who enters upon his premises by mere "sufferance," or "license," or "permission," and without "inducement," or "allurement," or "enticement," or "invitation." No refinement upon any of these terms is required in estimating the facts of this case. Its superintendent says the cement company "gave up" the track on

which the injury occurred to the brick company. It appears that this was done for the business purposes of the brick company and the railway company, and that the use contemplated involved the running of trains operated by crews of men back and forth over the track without previously communicating knowledge of the time of such action to the cement company. There was, therefore, a surrender of the property to the users, which, in effect, operated as a grant revocable at will.

It is immaterial that the consideration was one of favor only. The relationship established, whatever the motive, was the essential thing, and it follows from the testimony quoted that the track in question was, for all purposes of the law, the track of the railway and brick companies until the cement company chose to reclaim it. An obstruction of the track might be notice of a revocation of the authority to use it, but such notice should be communicated in some manner not jeopardizing life and limb in its cognizance. The use of the track by the railway company, and, therefore, by the plaintiff in the discharge of his duties as a member of one of its train crews, was lawful and was rightful against the cement company, and while the track was accepted in the condition it presented when given up, and subject to all the hazards it then disclosed, the owner could not, without notice, create new perils and escape liability for disasters entailed upon persons innocently relying on the former status of affairs. ( *Corby v. Hill*, 4 C. B. N. S. *556 ; *Corrigan v. Union Sugar Refinery*, 98 Mass. 577 ; *Pomponio, Admr., v. N. Y. N. H. & H. R. R. Co.*, 66 Conn. 528, 32 L. R. A. 530 ; *Barry v. N. Y. C. & H. R. R. R. Co.*, 92 N. Y. 289 ; *Morrow v. Sweeney*, 10 Ind. App. 626 ; 1 Thomp. Neg. §§ 968, 969.)

Under Moore's own testimony, he was not, as a matter of law, guilty of contributory negligence. The jury might well conclude that he understood the first question propounded to him as quoted above to relate to a general watchfulness of one trainman over another's welfare while occupied in the performance of duty, amid the perils of an employment presenting daily traps for them all, and not as comprehending prudence for his own safety while engaged in reaching and setting his brake. When the latter subject was pressed upon him, he answered: "I did n't have to look to see them." Under the law, it was his duty to observe all dangers threatened by any structure connected with, or incident to, the use of the track or movement of the train, but he was not bound to an anticipation of any obstruction not involved in, or relating to, the operation of the road. The gin-pole and guy-rope were impediments of such character. They had nothing to do with railroading at that place. They had no proper or rightful connection with any brakeman's environment, and he was no more compelled to guard against them than against some sudden trespass. If he had knowledge of their existence, he would be chargeable with the necessity of avoiding them, but he could not be careless respecting that of which he was ignorant, and of which he was not compelled to inform himself. ( *Kearns v. The Chicago, Milwaukee & St. Paul Ry. Co.*, 66 Iowa, 599; 7 A. & E. Encycl. of L. [2d ed.] 392; Beach, Contr. Neg. [3d ed.] § 36.)

Of course, no one can close his senses to that which is perfectly manifest and palpable; but whether or not Moore actually knew of his danger, and whether or not the position of the gin-pole and guy-rope were so conspicuously apparent as to make a failure to see

them negligence, under the circumstances attending his work, were questions for the jury. ( *Gustafsen v. Washburn & Moen Manuf. Co.*, 153 Mass. 468 ; *A. T. & S. F. Rld. Co. v. Rowan*, 55 Kan. 270, 39 Pac. 1010.)

While the evidence is conflicting in a number of important particulars, the verdict is amply sustained, and the judgment of the district court is affirmed.

All the Justices concurring.