THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY
v. JOHN J. QUINLAN.

No. 15,332.   (93 Pac. 632.)

SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Injury to Employee—Defective Appliances—Contributory Negligence—Assumption of Risk.* The plaintiff, a skilled machinist employed by the defendant, was engaged in the work of chipping a casting. He held a handled chisel while a helper struck it with a plainly defective sledge-hammer supplied by the defendant. A sliver of steel broke from the head of the sledge, flew into plaintiff's eye, and destroyed his vision. Under all the circumstances of the case, stated at length in the opinion, it is *held:* (1) The defendant was guilty of actionable negligence. (2) No duty rested upon the plaintiff to inspect the helper's sledge or to observe its defective condition. He could assume the defendant had performed its duty and had furnished the helper a proper tool. (3) The failure on the part of the plaintiff to observe the sledge did not constitute contributory negligence. He could be negligent only in case he saw the sledge or under the circumstances must have seen it. (4) The plaintiff and the helper were not fellow servants. (5) The plaintiff did not assume the risk of injury from the sledge. (6) The question whether the plaintiff saw the sledge or under the circumstances must have seen it was for the jury to determine.

Error from Labette district court; THOMAS J. FLANNELLY, judge. Opinion filed January 11, 1908. Affirmed.

*John Madden,* and *W. W. Brown,* for plaintiff in error.

*W. D. Atkinson,* for defendant in error.

Railway Co. v. Quinlan.

The opinion of the court was delivered by

BURCH, J.: The plaintiff was a skilled machinist employed by the defendant to work in its shops at Parsons. He was directed to fit a large casting, known as a smoke-stack saddle, upon the rounded top of the smoke arch of a locomotive. To do this it was necessary to chip off portions of the casting. The plaintiff marked lines on the casting to guide him in dressing it and secured it to a bench to hold it in position. He then held a handled chisel while a helper struck it with a sledge, the chisel being readjusted with reference to the marks on the casting after each blow. Just as the plaintiff was completing the preliminaries to the work of chipping the casting a helper named Fogleman appeared to do the sledging, bringing with him a sledge of his own selection from a collection of tools supplied to helpers by the defendant. The helper was sent to the work by a foreman, without direction from the plaintiff. The sledge was too highly tempered, and therefore brittle. There were old breaks in each face of it. It was defective and dangerous, and soon after work was begun a sliver of steel broke from it, flew into the plaintiff's left eye, and destroyed his vision. The plaintiff sued for damages and recovered.

In this proceeding in error it is alleged that the petition stated no cause of action; that no cause of action was proved; that the plaintiff was guilty of contributory negligence; that he assumed the risk of the injury which he suffered; that certain instructions given to the jury were inapplicable, because they left to the jury questions which the court should have determined as matters of law; and that the defendant is entitled to judgment on special findings returned by the jury.

The petition stated the nature of plaintiff's employment, his duties, the circumstances of the injury, and contained the following allegations:

"That said sledge-hammer, so used by the said James

W. Fogleman, was by defendant supplied and furnished to the servants and employees of defendant engaged as helpers to machinists, for their use in the work about said repair- and machine-shops of defendant; that said sledge-hammer was improperly and too highly tempered, was hard and brittle, would break and sliver off when used, was because thereof not reasonably safe for use, and was because thereof a dangerous and defective tool for use, which facts, from the use and from the appearance of said hammer, were well known to defendant or by the exercise of ordinary care might have been known to defendant."

It is said that this simple charge of knowledge and of means and opportunity for knowledge on the part of the defendant demolished the plaintiff's cause of action. The argument runs thus: The knowledge of the defendant as to the condition of the sledge was no greater than that of the plaintiff; if the defects in the hammer could be ascertained by use and appearance the plaintiff, "who was the last to see the hammer in use before his injury," could have ascertained them; he was called upon for his own protection to make observations and take precautions respecting the tool, particularly since the defects were ascertainable by use and from appearance, and no greater duty in this respect rested upon the defendant than upon the plaintiff.

The same argument is made in discussing the sufficiency of the evidence, the negligence of the plaintiff, assumption of risk, the pertinency of the instructions, and the effect of the special findings. It is continually asserted that the plaintiff owed the duty of scrutinizing his helper's hammer, that he was obliged to know, because of the use and appearance of the tool, if it was safe, and that the defendant's duty of observation rose no higher than that of the plaintiff. Since the argument is based upon a fallacy which permeates the entire brief for the defendant it may as well be disposed of now and once for all.

No duty rested upon the plaintiff to make an inde-

pendent investigation of the sledge which the helper brought to the work for the purpose of ascertaining if it was safe for use. It was the master's duty to provide the helper with a fit tool. It was not incumbent upon the plaintiff to stop his work to see if that duty had been performed. He could rest upon the assumption that the master would not permit a helper to appear with a defective sledge. Therefore, unless his attention was in fact drawn to the imperfections of the sledge, or unless the sledge was so obtruded upon his gaze that he could not but observe it, the injury could not be charged to any want of care or breach of duty on his part. These principles are fundamental in the law of master and servant, and it is merely carrying coals to Newcastle to cite authorities for them. However, the case of *Buoy v. Milling Co.*, 68 Kan. 436, 75 Pac. 466, is instructive. The facts are stated in the opinion as follow:

"James Buoy, an employee of the Clyde Milling and Elevator Company, who was assisting in the construction of a warehouse, was injured by the fall of a negligently constructed scaffold. . . . Miller, the general manager of the company, employed Richa to complete the building, and told him that he would send Buoy around to help him. According to plaintiff's testimony, Richa had worked some time and had practically completed the scaffold when Buoy arrived at the building. Buoy inquired if the scaffold was safe, and the reply of Richa was that it could not be pulled down with a team. Plaintiff went upon the scaffold with Richa and within a few minutes it fell to the ground and the plaintiff was seriously injured." (Page 437.)

The syllabus of the case reads:

"The furnishing of a safe place to work and safe appliances with which to do the work is among the absolute duties of the master; and unless the servant's attention is drawn to defects or the dangerous condition of the place or the appliances furnished, or he should have known of them, he is not required to make an investigation, but may rest upon the assumption that the master has performed his duties in these respects."

In the opinion it was said:

"The furnishing of a safe place to work and safe appliances with which to do the work are among the absolute duties of the master. From the testimony a fair inference may be drawn that these duties were not performed. It is said, however, that plaintiff had an opportunity to examine and must have examined the scaffold before using it. According to the testimony he was told to go to the assistance of the carpenter, and when he went he found a scaffold erected upon which he was expected to work, and, unless there was a very obvious defect, he had a right to assume that it was properly built. (*Kelley v. Railway Co.*, 58 Kan. 161, 48 Pac. 843.) . . . We cannot say that he should have known of the insecurity of the scaffold. Unless his attention was drawn to defects or to the dangerous condition, he was not required to institute an investigation, but might rest on the assumption that the company had performed its duty. . . . As we have seen, the scaffold was not built by him, and the accident occurred within a few minutes after he began work on it. It cannot be arbitrarily said that he knew, or should have known, of the danger to which he was exposed. Under the law, it is not only necessary that the employee shall know of the facts constituting the negligence of the master, or have opportunity to know them, but, in addition to these facts, he must have known, or by the use of ordinary observation ought to have known or understood, the danger to which he was exposing himself by reason of those conditions." (Pages 443, 444.)

With but slight modification this syllabus and opinion could be adopted in the present case. The fact that the helper used a sledge the appearance of which condemned it was not conclusive upon the plaintiff. Such fact did not bind him to knowledge of the sledge's unfitness for use or appreciation of the danger in using it. His relation to the sledge was not the same as that of the defendant, who was obliged to perform the active duty of furnishing its helpers with safe sledges. The plaintiff was under no duty to examine the sledge or to inquire into its condition. He could only be held to knowledge of facts actually brought home to him, or

which, under the circumstances, he could not but possess; and there is no warrant in the law for arbitrarily attributing such knowledge to him. So much being clear, it is plain the petition stated a cause of action and the court was required to proceed to a trial.

The plaintiff was employed in the mechanical department of the railway company, which was under the supervision and control of William O'Herin, superintendent of motive power and machinery. W. H. Brehm was master mechanic in general charge of the shop in which plaintiff worked. James A. Wilson was foreman of the shop. The workmen in the shop were divided into three gangs, each under a foreman. The plaintiff belonged to gang No. 3, of which Robert E. Bates was foreman.

The helpers of each gang did only unskilled and heavy work. Appropriate tools were provided for their use. Each evening the foreman of each gang ordered the tools for the helpers of his gang to be collected into a cupboard, or locker, of which he kept the key. This cupboard the foreman locked at night and unlocked in the morning. When the cupboard was unlocked the tools were likely to be thrown upon the shop floor. Each helper took from the floor or from the locker such tools as he needed. Sometimes tools strayed from one part of the shop to another, and it so happened the plaintiff was injured by a sledge belonging to gang No. 1. The same rules of oversight by gang-foremen prevailed, however, throughout the shop.

Gang-foreman Bates ordered the plaintiff to do the work upon which he was engaged, and ordered helper Fogleman to assist him, but no one ordered Fogleman to use the sledge in question. When he undertook to equip himself for work Fogleman found no hammer in the cupboard of suitable weight for the light work of chipping a casting. Looking about, he found this one on the shop floor.

The jury found specially that the sledge was not of the kind, character, quality and appearance of those

constantly used by the helper before the time of the accident; that it was not a reasonably safe tool for use; that it was too highly tempered, hard and brittle, and would break and sliver off when used; that these defects appeared on the face of the hammer; and that it was defective and dangerous.

The evidence may be taken as establishing the fact that the defendant equipped the shop with a supply of safe hammers. Indeed, the plaintiff said that before he was hurt he had never seen a defective hammer in the shop. When defective hammers were discovered by the machinists they were reported to the gang-foreman and either repaired or discarded. The defendant had no actual knowledge of the defects in the hammer which Fogleman used. No one had ever objected to it or asked that it be repaired, and it was first brought to the attention of those having authority after the plaintiff was injured.

The jury found specially that the plaintiff did not know the defective condition of the sledge before he was injured, but held the defendant responsible, returning the following special findings in connection with the general verdict:

"(9) Ques. Do you find from the evidence that the said sledge-hammer was furnished by defendant to the servants of defendant for their use? Ans. Yes."

"(16) Q. Do you find from the evidence that said sledge-hammer had been a long time in use by the helpers in the machine-shops of defendant? A. Yes."

"(36) Q. Does the evidence disclose the fact that the appearance of the hammer was such as to indicate that it was a dangerous and defective tool for use, and that the defendant by the exercise of ordinary care might have known the defective condition of the tool from its appearance? A. Yes.

"(37) Q. If you answer the above question in the affirmative, you may state how the railroad company could have known of the defective condition of the tool in the exercise of ordinary care? A. Through foreman."

"(17) Q. Do you find from the evidence that James A. Wilson, in the discharge of his duty, by the exercise

of ordinary care could have known of the condition of said sledge-hammer at the time plaintiff sustained injury? A. Yes.

"(18) Q. Do you find from the evidence that Robert E. Bates, in the discharge of his duty, by the exercise of ordinary care could have known of the condition of said sledge-hammer at the time plaintiff sustained injury? A. Yes."

The defendant argues that it discharged its duty to the plaintiff and that no negligence on its part was proved. It furnished safe tools. It did not direct this tool to be used. It had no knowledge of the fact that a defective tool was in use; and it asks the question, How could the defendant know that the sledge was unsafe when the plaintiff did not know it?

The evidence and special findings so far adverted to do not complete the proof favorable to the plaintiff. There is much more which the defendant in its argument overlooks or ignores.

The defendant did not stop with supplying proper tools for helpers to work with. The helpers were unskilled men, without the expert knowledge necessary to determine whether tools were safe or unsafe, and the defendant undertook, not merely as a matter of law but as a matter of fact, to see and know whether the helpers' tools were in proper condition for use. The testimony of Mr. James A. Wilson, general foreman, is conclusive upon these questions:

"Ques. What position do you hold with reference to the defendant in this action? Ans. General foreman of the Missouri, Kansas & Texas shops in Parsons, Kan."

"Q. Frequently during the day do you usually get around the gangs where gangs Nos. 1, 2 and 3 are at work? A. I pass through the gangs maybe twenty or thirty times a day, and maybe more than that.

"Q. There is a foreman with each one of the gangs? A. Yes, sir.

"Q. So, then, there is to direct the work of the machinists—what is to be done, how it shall be done— Mr. Brehm, yourself, and the foreman of the gang in which they are at work? A. Yes, sir.

"Q. And that is the duty of all the three of you? A. Yes, sir.

"Q. As you pass around on the floor where these gangs are at work you see the tools lying around there do you?  A. I generally do; yes, sir.

"Q. One of your duties is to see what is there, is it not?  A. Yes, sir."

"Q. What would you have done, and what would have been your duty, had you seen this hammer in the condition it was delivered to you in either of the gang-foremen's cupboards, or upon the floor for use?  A. Why, I would have taken it up.

"Q. What do you mean by 'taken it up?'  A. I would take it away, take it out of the shop, because I considered it a tool to be put in shape and in condition.

"Q. In other words, you considered it to be an unsafe tool to be used?  A. Under the conditions, yes.

"Q. Would it be the gang-foreman's duty to know its condition and call your attention to it?  A. Not where his attention was called to it.

"Q. Is n't it his duty to look after everything that is there under his charge?  A. Everything under his charge; yes, sir.

"Q. Are not the tools that are furnished to the helpers to be used under the charge of the gang-foreman? A. They are.

"Q. Then it is his duty to know whether a tool is a safe tool or unsafe tool for their use, is it not?  A. It is.

"Q. And when he discovers that it is an unsafe tool for use, it is his duty to see that it is not used, is it not? A. Yes, sir.

"Q. And to take it up?  A. Yes, sir.

"Q. Either to take it to the blacksmith's shop or cause it to be taken there and worked over, or take it or cause it to be consigned to the scrap heap?  A. Yes, sir.

"Q. And the helpers are not supposed to have, or possess, any skill in the matter of determining what are safe or what are unsafe tools to use, are they?  A. No."

Much other testimony is to the same effect.

The plaintiff, as a machinist, was rarely called upon to handle helpers' tools.  There is no finding that he was charged with the duty of examining helpers' tools to determine if they were fit for the helper to use. There is abundant evidence that such was not his duty.

Railway Co. v. Quinlan.

The helpers were incompetent to judge of the fitness of the tools they used. That function the company reserved to itself, and the evidence quoted means nothing less than that the presence of a sledge-hammer in a cupboard or on the shop floor constituted a license from the gang-foreman to every helper to use it, whether better ones were available or not.

Wilson and Bates each gave testimony to show that it was the duty of the machinists to inspect the tools of their helpers, but the jury evidently did not credit them in this respect, and based their verdict and special findings upon the evidence to the contrary. It was the special province of the jury to resolve conflicts in the evidence, and this court cannot reinvestigate the matter.

That the defendant had ample time and opportunity to discover the defective condition of the hammer after it had become unfit for use was fully proved, so that the defendant's duty and breach of duty were clearly established. The answer to the question propounded by the defendant in connection with its argument upon this branch of the case is now very plain. Under the law and under the organization and rules of the shop no duty of active vigilance rested upon the plaintiff with respect to the fitness of his helper's tools. He could rest under the assurance that the master had performed its duty and take it for granted that the sledge was a proper one. The foreman was obliged under the law and under the organization and rules of the shop to inquire and see and know whether the helpers' tools were reasonably safe. Reasonable opportunity having been afforded to the foreman to ascertain the facts, the defendant is held to all the consequences of knowledge. The plaintiff is bound only by what he actually knew or under the circumstances could not but know.

The defendant claims that the plaintiff and his helper were fellow servants; that since the defendant furnished proper tools the choice of a defective sledge was

the negligent act of a fellow servant, and hence that no cause of action was proved. From the evidence quoted it is plain the helper exercised no intelligent choice. He was not on the same plane as either the plaintiff or the defendant. He did not have the requisite capacity to determine between the qualities of different tools, and no duty rested upon him to make a choice so far as fitness for use was concerned. The foreman chose all the helper's tools, and placed them at his disposal as being safe for use. Any so-called selection the helper might make was the selection of the foreman, and if the tool proved defective the foreman was responsible and not the helper.

It is strenuously insisted by the defendant that the plaintiff was guilty of contributory negligence in not observing the defects in the hammer and preventing its use. The entire argument, however, is confused and vitiated by the improper assumption noted in the discussion of the sufficiency of the petition. Negligence involves a breach of duty. When there is no duty there can be no neglect of duty. If a specific kind of care is for any reason not required in a given case a person cannot be negligent in failing to use such care. The defendant's duty required that it should see and know what kind of a sledge the helper was using, and the failure to discharge that duty constituted actionable negligence. No duty rested upon the plaintiff to see and know what kind of a sledge the helper used. He did not owe it to the defendant or to the helper or to himself to look. He could remain passive under the assurance that the master had fulfilled its obligation. Therefore his failure to observe the defects in the hammer did not constitute negligence barring recovery.

The prudence of the plaintiff's conduct is further shown by the following very enlightening bit of testimony given by Robert E. Bates, foreman of the plaintiff's gang:

Ques. If, as a machinist, you had been working upon

that same piece of work 'which Quinlan was working upon, dressing the smoke-stack saddle, and Fogleman or any other helper had started to get that hammer; if you had not known there was a defective hammer in use upon the floor, it would not occur to you to look at the hammer he was using for defects, would it? Ans. No, sir.

"Q. It would not occur to any machinist under those circumstances to look and see whether it was safe or unsafe to handle, would it? A. I don't think it would."

The defendant shapes its argument to do further service under the heading of assumption of risk. Assumption of risk is an element of the contract of employment. A servant assumes only those hazards which are the natural incidents of the employment. Tools which are dangerously defective are not the natural incidents of any employment. It is the master's absolute and unassignable duty to supply safe ones. If defective tools are furnished the servant may assume the risk attending their use, but he can be held to have done so only when he has knowledge or the equivalent of knowledge of the facts and of the danger. The subject is fully discussed and assumption of risk and contributory negligence are discriminated from each other in the case of *Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990. The flying of chips of metal from the casting the plaintiff was dressing was a natural incident of his work. He was bound to know that such a result would follow from the pounding of his chisel by the helper's sledge, and was required to take all necessary precaution to protect himself from injury from that source. But he was not bound to take any steps to protect himself from a defective sledge when he could take it for granted the master had given the helper a sound one.

It is said the plaintiff knew how to temper steel, knew that sledges tempered until they were brittle would break under use, knew all about the kind of work done in the shops, knew that sledges were used for striking blows upon chisels, could comprehend a simple tool like a sledge, had good eyesight, was in fact

a skilled mechanic, and had the means of knowing if this sledge was defective; all of which is true. But he had the legal right to rest upon the belief that the master would not·violate its duty and negligently expose him to the hazard attending the use of a dangerous sledge.

It is said the test of the tool was use; that the master could learn whether the tool was defective only by putting it to use, and that while the tool was in use the plaintiff assumed the risk. The argument is unsound in several respects, but it is enough to note a single flaw: The hammer was too old. The test had been made, and the proof of deficiency was written upon both ends of the implement long before the plaintiff lost his eyesight. When ample evidence of unsuitability for use had been supplied by use the plaintiff had the right to rely upon the master to perform its duty to take up the tool and no longer endanger his safety by permitting it to be used.

The one close question in the case now presents itself. Already it has been foreshadowed, and is this: Was the hammer so paraded before the plaintiff's eyes that he must have seen it? If so, he was fully competent to estimate the probable consequences of using it and acted at his own peril. If not, he is entitled ·to judgment.

The defendant does not segregate this question and discuss it upon its merits, but, starting from the false premise that it was the plaintiff's duty to·inspect and observe equally with the master, readily reaches the conclusion that the plaintiff's opportunity to see furnished the virtual equivalent of knowledge. The subject is partially covered by findings of fact which read as follow:

"(14) Ques. Do you find from the evidence that plaintiff at the time he sustained injury knew the condition of said sledge-hammer? Ans. No.

"(15) Q. Do you find from the evidence that at the time plaintiff sustained injury he was exercising ordinary care to prevent injury to himself? A. Yes."

Railway Co. v. Quinlan.

"(18)  Q.  You may state whether the plaintiff had good eyesight and was a reasonably careful and prudent man in observing the place where he had to work and the tools which he and his helper had to use.  A.  Yes.

"(19)  Q.  Is it a fact that while the plaintiff held the chisel and his helper, James W. Fogleman, used the sledge-hammer in striking, the plaintiff could see said sledge-hammer as it was raised and lowered and could see the same when it descended upon and struck the chisel which was held by the plaintiff?  A.  Yes, when his attention was not directed to the point of chisel used by him.

"(20)  Q.  Was there anything to prevent the plaintiff from observing the sledge-hammer and the condition of the same at the time he commenced his work in chipping off the casting and during the time he was engaged in his work?  A.  No."

"(26)  Q.  Is it a fact, as shown by the evidence, that machinists engaged in the shops of the defendant company at Parsons, holding chisels in the kind of work in which the plaintiff was engaged, ought to turn their faces away when the hammer descended upon the chisel, for the purpose of saving their face from flying particles?  A.  No."

"(28)  Q.  You may state what is the fact as to whether the plaintiff turned his face away as the sledge-hammer descended upon the chisel which he held during the time that he was making the repairs upon the locomotive and at the time he received his injury.  A. No.

"(29)  Q.  You may state what defect, if any, existed in the sledge-hammer that was used by James W. Fogleman at the time of the injury of the plaintiff?  A.  Such defects as appeared on the face of the hammer."

"(38)  Q.  Would an examination of the tool, from its appearances and conditions, have revealed the fact to the plaintiff that it was a defective tool?  A.  Yes."

"(40)  Q.  Would an examination of the tool by the plaintiff at the time of the commencement of his work on the day of his injury have revealed the fact that it was improperly and too highly tempered, and consequently was hard and brittle and would break and sliver off when used?  A.  Yes."

"(63)  Q.  You may state what observation, if any, as disclosed by the evidence, was made by the plaintiff

in ascertaining the condition or appearance of the sledge-hammer at the time the same was selected by his helper or during any period of time when the same was being used. A. None."

It is not shown how the helper carried the sledge when he came to the place where the plaintiff's work was to be done—whether upon his shoulder, or at his side, or in front of him, or by the end of the handle with the slivered head near the floor. The plaintiff was absorbed with the details of his own part of the work. The sledge was not in his thought. He was under no obligation to consider it. He was not obliged to suspect danger. He could rest secure that the helper had a safe sledge without taking notice. It was his business to prepare the casting to be chipped, and when that work was performed to adjust his chisel to the line where the cutting was to begin. Up to this point he had no occasion to look at the sledge, and from that time forward his eye was directed, not to the head of the chisel, where the hammer scarcely paused between strokes, but to the cutting edge of the chisel and the lines marked on the casting. The plaintiff testified as follows:

"Ques. When you felt the blows come down on the chisel which you held, and you observed the blows were all right, and that the hammer was all right as to weight, what was there to prevent you looking at the hammer when it descended on the chisel? Ans. Well, I was keeping track of the line where I was cutting.

"Q. In keeping track of the line, would n't you necessarily have to keep your eye on the chisel and the hammer as it fell too? A. No, sir.

"Q. Would you permit yourself to hold a chisel with a man who was using a dangerous hammer? A. Not if I knew it I would not.

"Q. Were you not yourself in duty bound to make an examination of the hammer before you commenced to work? A. No, sir; that was not my duty.

"Q. Did n't you know it was your duty to report any defective tools you might find in your line of work to the gang-foreman that might be in your charge? A. Any one I had charge of.

"Q. You did n't take charge of it and your helper might have charge of it and you would still sit by and allow him to use a defective tool on the chisel? A. Not if I knew it.

"Q. Weren't you called upon to use your eyesight? A. Not that I remember of."

"Q. You knew sparks and chips would fly from this casting? A. Yes, sir.

"Q. If there were glancing blows on that chisel you might be injured that way if the hammer was defective and there might be pieces fly from it; you would know that? A. If the chisel was not held in proper position.

"Q. Or if the hammer was badly battered the pieces might fly off? A. It is all a man can do to hold one of them chisels and keep track of the line; he cannot look around and examine anybody else's tools, and it is not customary."

"Q. Now, if you were particularly careful in selecting the chisel that you were holding yourself, will you explain to the jury why you would not make an examination of the tool your helper was using and see whether it was just as safe as the one you used? A. I had nothing to do with the helper's tools.

"Q. You relied upon the fact that the helper would get a good tool, one that was not defective, and use it; is that it? A. Yes, sir."

"Q. Now, Fogleman came to you about seven o'clock, did he, to work? A. Somewhere in that neighborhood in the morning.

"Q. Well, did he have the hammer when he came? A. Well, I don't remember whether he did or not.

"Q. You knew he could not do the work that you had to do without the hammer? A. When I held the chisel up and was ready for him, he had the hammer then.

"Q. That is the first time you noticed the hammer, was it? A. I never took no particular notice of the hammer; he just started right in striking when I says 'we are ready.'

"Q. When you said 'we are ready' you are assuming he had the hammer? A. Yes, sir.

"Q. Did you notice it at the time when you said 'we are all ready'? A. No.

"Q. You never took any notice of it even then? A. No."

"Q. Did you see Stevens or Robinson there while

you were working and cutting away this saddle? A. I never noticed anybody in particular.

"Q. Did you know Stevens and Robinson were right on the other side of the bench from you? A. I never noticed anybody."

"Q. As a matter of fact, you were not taking notice of anything that morning? A. Not but what I was working on; that is all I was watching—my job fitting the saddle."

"Q. Now, although you were facing in this direction, yet you did n't see whether any persons were working here? A. I never noticed.

"Q. Although you were standing and facing that way, and looking this way; but you were looking at your hammer? A. I was looking at the edge; there was a little bit of a line that I started, and I watched right close to it. Of course, I could not see the line half the time, but it is a mark made by machinists to govern where to cut, and I was holding my chisel on that line."

"Q. What was absorbing your attention in the dressing of this casting, and where was your attention directed? A. Directed right on the line of the cutting edge of the chisel.

"Q. What line do you mean? A. The line where I was taking off material to fit—where I had marked it off.

"Q. Is the dressing and fitting of a smoke-stack saddle particular work? A. Yes, sir.

"Q. What is there about it that requires careful and close work? A. It must fit nice and snug over the boiler and leave no holes. It has a curved surface.

"Q. On account of the curvature on the top of the boiler? A. Yes, sir.

"Q. Was it that that was absorbing your attention at the time of dressing the casting to that line? A. Yes, sir.

"Q. Is that why you did n't observe whether or not there were other parties before you? A. Yes, sir."

The helper, Fogleman, testified as follows:

"Ques. What did Quinlan appear to be giving his attention to at the time? Ans. He was holding the chisel, looked as though he was watching the line; he had his cap kind of pulled over his eyes holding his chisel; I don't remember the position in which he was holding it, but he was holding it at arm's length.

Railway Co. v. Quinlan.

"Q. Where did his attention appear to be directed? A. To the cutting end of the chisel.

"Q. Following the lines? A. Seemed to. I was not watching Quinlan particularly; I was watching where I was striking—at the other end of the chisel."

"Q. You were directing your attention to the surface of the chisel? A. To the center part of it.

"Q. That is where your attention was directed? A. Yes, sir.

"Q. Where did Quinlan's attention appear to be directed at the same time your attention was directed there? A. At his chisel, cutting to the line where he was cutting; his attention seemed to be directed there. I did n't see him look around at anything; in fact, he did n't have time. I was striking every time he set the chisel.

"Q. State what you mean by that. A. Every time I would strike and cut a chip he would bring his chisel back and set it at the place where he wanted to cut, and every time the chisel cut he would bring it back and set it. Of course, I had to wait until he set his chisel and I did n't come down as fast as I pleased. I struck when he had his chisel set, and therefore I had to watch the chisel."

C. B. DeDual, a machinist, testified as follows:

"Ques. You observed him [Quinlan] while he was at work, did you? Ans. Yes, at times.

"Q. You observed where his attention was directed at those times when you did observe him? A. Yes, sir.

"Q. State to the jury where his attention was directed. A. His attention was directed to the smoke-stack saddle that he was chipping."

It is the duty of the court to harmonize special findings with each other and with the general verdict, if that can be done. The jury have found specially that the defendant was a careful and prudent man, and was in the exercise of reasonable care, although he did not observe what he might have seen had he looked. The reason he did not observe the sledge as it rose and fell is fairly stated by the answer to question No. 19. Finding No. 20, considered in connection with the others and with the general verdict, evidently means no more than

that no physical obstruction to a view of the hammer precluded the plaintiff from seeing it. The other findings merely establish the fact of opportunity to see defects which were visible to any one looking at the sledge, and that the plaintiff, with good eyesight, did not see.

Under the circumstances the question was one of fact, and being a question of fact the inference of the jury expressed in the general verdict is controlling. It is very true that in many cases this court can and will disregard a conclusion of fact drawn by a jury. No matter what may be the opinion of the jury, the court will not tolerate the conclusion that a man did not see what he could not avoid seeing. If a person with good eyesight stand upon a railway track, have an unobstructed view of an approaching train, and look in the direction of the train, a jury cannot be allowed to say, after he is run down, that he did not see the train. In such a case different minds could not rightfully reach different conclusions. Only one inference could rightfully be drawn, and it would be the duty of the court to disregard any other. Usually the question arises in cases where a duty to be observant exists and the facts are to be estimated with reference to that duty. Here the legal obligation to see is wanting, and different opinions might well be entertained upon the question whether the plaintiff must have seen. Therefore the question was one for the jury. (*St. L., Ft. S. & W. Rld. Co. v. Irwin,* 37 Kan. 701, 16 Pac. 146, 1 Am. St. Rep. 266; *A. T. & S. F. Rld. Co. v. Rowan,* 55 Kan. 270, 39 Pac. 1010; *Rouse v. Ledbetter,* 56 Kan. 348, 43 Pac. 249; *Railway Co. v. Michaels,* 57 Kan. 474, 46 Pac. 938; *Cement Co. v. Moore,* 65 Kan. 762, 768, 70 Pac. 864; *Hoffmeier v. Railroad Co.,* 68 Kan. 831, 75 Pac. 1117.

Certain decided cases cited by the defendant may be briefly discriminated: In *Lanyon v. Bell,* 64 Kan. 739, 68 Pac. 609, the plaintiff's work lay amid stacks of zinc spelter. They were a necessary part of his environ-

ment. Their condition was open and observable, no negligence of the defendant was shown, and the plaintiff was held to be chargeable with knowledge of what he could, and under the law was bound to, see. In this case the defective sledge had no rightful. place in the midst of the plaintiff's surroundings. It was an intruder of whose presence the plaintiff was ignorant, one which he was not bound to observe, and one which could be there only through the defendant's negligence.

In *McQueen v. C. B. U. P. Rld. Co.*, 30 Kan. 689, 1 Pac. 139, an employee injured because of defective wheels on a hand-car had used the car, had examined it, and several times had wiped oil off the defective wheels. Of course he not merely had full opportunity to see but must have known the condition of the wheels.

In *Libbey v. Railway Co.*, 69 Kan. 869, 77 Pac. 541, a train conductor was struck by a train moving upon a track in the railway yards. Railway tracks are warnings of danger. They are laid for the purpose of running trains upon them, and every man must be vigilant in keeping out of the way of railway-trains. The following sentences from the opinion sufficiently distinguish the case from the one now under decision:

"He knew the dangers of the place; he voluntarily and unnecessarily put himself into a place of danger; and he took no precaution for his own protection. In stepping upon a railroad track in front of a moving train without looking or listening, he ignored the plainest dictates of ordinary prudence." (Page 870.)

In the case of *Jackson v. K. C. L. & S. K. Rld. Co.*, 31 Kan. 761, 3 Pac. 501, a train conductor continued to use a defective step, with full knowledge of the defect, until he was hurt. Comment is scarcely necessary. In the case of *U. P. Rly. Co. v. Estes*, 37 Kan. 715, 16 Pac. 131, an employee voluntarily and unnecessarily placed himself in a place of danger, and in the case of *Carrier v. Railway Co.*, 61·Kan. 447, 59 Pac. 1075, an employee voluntarily and knowingly chose an unsafe instead of a

safe way of doing his work. In *Railway Co. v. Withers,* 69 Kan. 620, 77 Pac. 542, 78 Pac. 451, the syllabus reads:

"One may not knowingly stand upon a railroad track in a switch yard, or so near thereto as to be in an equally dangerous position, where he knows, or has reason to know, that cars may run at any time (another position being equally available), neglect to use his ordinary faculties to guard against danger, and, when injured through the negligence of the railroad company by a car passing along such track, recover damages. His contributory negligence bars such recovery."

This is a restatement of the rule applied in the Libbey case. The plaintiff in the case under consideration was in a place of safety, and was not required to be on guard against the use of a defective sledge.

In the case of *Railway Co. v. Weikal,* 73 Kan. 763, 84 Pac. 720, it was held the plaintiff assumed the risk of injury from flying pieces of steel chipped off in furrowing out a key-seat in a steel shaft. The decision is sound, but not pertinent. The hazard was one which naturally and necessarily attended the work. So, in this case, the plaintiff and his helper assumed the risk of injury from chips of the casting they were dressing. But the doctrine of assumption of risk does not apply when the master, without notice or warning to the servant, exposes him to some danger which does not inhere in the employment.

In the case of *Rush, Adm'x, v. Mo. Pac. Rly. Co.,* 36 Kan. 129, 12 Pac. 582, a switchman worked in the defendant's yards doing switching every day for two and a half months. It was held he must have known the condition of those yards. He made no complaint of their condition, and it was held he assumed the risk. In this case a defective sledge was unexpectedly placed, not in the plaintiff's hands, but in the hands of his helper. The plaintiff was busy with work which did not require him to use or see the condition of the tool, and within an hour or two he was injured.

In the case of *A. T. & S. F. Rld. Co. v. Wagner,* 33 Kan. 660, 7 Pac. 204, it was not shown that the railway company was negligent, and the danger from which the plaintiff suffered was an ordinary and usual one naturally attending the work in which he was engaged. In the case of *U. P. Rly. Co. v. Monden,* 50 Kan. 539, 31 Pac. 1002, it was the plaintiff's legal duty to be vigilant in noting marks and signs to designate an approach to a junction. He had made one trip over the road. It was held the court should have instructed the jury upon the question whether the plaintiff ought not to have known there was no marker at a particular junction. The case of *Railway Co. v. Sledge,* 68 Kan. 321, 74 Pac. 1111, relates to the continued use of a defective appliance after a promise to repair.

In the case of *Walker v. Scott,* 67 Kan. 814, 64 Pac. 615, Scott was engaged in digging a trench and was injured by a slipping of the bank. The following extract from the opinion shows how foreign the decision is to the present controversy:

"He was fully alive to all the dangers of his employment and knew the conditions as completely as any one could. It was his judgment and belief that a cave-in would occur." (Page 817.)

The case of *Donnelly v. Packing Co.,* 68 Kan. 653, 75 Pac. 1017, involves a question of coservice, a subject which already has been sufficiently discussed. In the cases of *A. T. & S. F. Rld. Co. v. Schroeder,* 47 Kan. 315, 27 Pac. 965, *S. K. Rly. Co. v. Moore,* 49 Kan. 616, 31 Pac. 138, and *S. K. Rly. Co. v. Drake,* 53 Kan. 1, 35 Pac. 825, the injured employees had full actual knowledge of all the dangers attending their work.

Much reliance is placed by the defendant upon the case of *Gillaspie v. Iron-works Co.,* 76 Kan. 70, 90 Pac. 760. There the plaintiff was injured by a piece of steel flying from the battered top of a snap, or set, when struck by a sledge-hammer in the process of riveting metal beams together. The plaintiff went personally with another workman to a tool-box and selected the de-

fective tool with all its imperfections staring him in the face. Besides this, he personally assisted in heating a piece of wire and bending it around the snap for a handle. He saw and knew the condition of the snap, and this court held him to the consequences of his actual knowledge, all of which were within the comprehension of an ordinarily intelligent man. If the plaintiff in this case had voluntarily gone to the cupboard where the helpers' tools were kept, had selected a hammer head, had heated a wire and bent it around the hammer head for a handle, and then had turned the tool over to his helper to be used, the two cases would be parallel, and the court would say of the plaintiff, as it did of Gillaspie, that he saw the battered faces of the sledge, knew the cause of its condition, knew that slivers of steel would fly from it, and knew the danger attending its use.

The defendant has cited no decision of this court which would warrant its release from liability. On the contrary, the cases cited, together with the others which have been referred to, establish a consistent body of legal principles which authorize a recovery by the plaintiff and with which the court is entirely satisfied.

Some decisions from other states are presented for consideration. They have all been examined. Some of them are quite wide of the mark. One or two contain statements difficult to reconcile with the settled views of this court. So far as they do this, they are disapproved. All of them are distinguishable by giving close attention to the facts. None of them presents the peculiar situation disclosed by the evidence and findings under review.

If the plaintiff, a skilled machinist, had been voluntarily and deliberately using the defective tool, the entire aspect of the case would be different. He would not be permitted to escape the consequences of knowledge. If the helper had been a machinist of equal grade and capacity with the plaintiff, or of sufficient capacity to estimate the fitness of tools for service, and the master

had left it to the workmen to determine when a tool was worn out or unfit for further use and to report the fact, it might be said that each workman should be on guard against the use of defective tools by his associates. Then the cases cited might be controlling. But the plaintiff in this case had no supervision over helpers' tools, so far as fitness for use was concerned. Those tools belonged to a distinct class. The helpers were not themselves able to pass upon the question of the fitness of their tools. The master undertook to supply this deficiency of knowledge and judgment through its foremen, so that whenever a helper took up a tool for work the machinist had the master's guaranty that it was safe for use and would not injure him.

Since other opinions must be printed in the same volume of reports with this one, the discussion cannot be extended further. In the light of what has been said, the court rightfully overruled the demurrer to the evidence. The jury were properly instructed, the motion for judgment on the findings was properly denied, and a new trial was rightfully refused.

The judgment of the district court is affirmed.