No. 69,826

DANIEL SMITH, *Appellee/Cross-Appellant*, v. MASSEY-FERGUSON, INC., a Maryland Corporation; MASSEY-FERGUSON LTD., a Canadian Corporation; VARITY CORPORATION, a Delaware Corporation; and DEAN STROBERG, *Defendants*, and DAVID STROBERG, *Appellant/Cross-Appellee.*
(883 P.2d 1120)

Opinion filed October 28, 1994.

*Norman R. Kelly*, of Norton, Wasserman, Jones & Kelly, of Salina, argued the cause and was on the briefs for appellant/cross-appellee.

*Donald A. McKinney*, of Michaud, Hutton, Fisher & Andersen, of Wichita, argued the cause, and *Donald S. Andersen* and *Chan P. Townsley*, of the same firm, were with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Daniel Smith, plaintiff, brought this action against Massey-Ferguson, Inc., (Massey-Ferguson) the manufacturer of a combine; Dean Stroberg, his employer and owner of the combine; and David Stroberg (Stroberg), the son of Dean Stroberg. Before trial began, Smith entered into a settlement agreement with Dean Stroberg. Before any evidence was presented, he settled with Massey-Ferguson. The jury found and apportioned fault as follows: David Stroberg 60%, Massey-Ferguson 10%, Dean Stroberg 20%, and Daniel Smith 10%. The jury awarded Smith $534,138. Stroberg appeals from the verdict; Smith cross-appeals, arguing for changes in the instructions and

the verdict form if the case is remanded. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

On June 19, 1989, Daniel Smith's hands were injured in the moving parts of a Massey-Ferguson combine. On that day, he was driving the combine for the wheat harvest on land owned by Dean Stroberg. Smith reported to David Stroberg and received instructions from him about what tasks were to be performed, what equipment was to be used, and where the cutting would start.

At trial, Daniel Smith was 28 years old and worked as a carpet installer and cleaner at a store owned by his father. In 1984, he received an associate degree in technical education from the Hutchinson Community Junior College. While a student at the junior college, he learned of a job opening with the Stroberg farming operation in northern Reno County. He interviewed with David Stroberg and began working there part-time. He continued this part-time employment up to and even after his injury. Dean Stroberg paid Smith, and Smith considered himself to be employed by Dean Stroberg.

Dean Stroberg is the father of David Stroberg. Dean Stroberg was 74 at the time of trial. For 30 years he had manufactured cattle-handling equipment. He also raised cattle and grew alfalfa, wheat, corn, and beans on 3,000 to 4,000 acres.

At the time of trial, David Stroberg was 36. His residence was several hundred yards from the house where his parents lived. As a teenager, he first worked part-time for Stroberg Equipment Co, Inc., the cattle-handling equipment manufacturing company. In the early 1980's, he obtained from his father an ownership interest in the company. Also during the late 1970's and 1980's, David gradually developed and expanded his own farming operation. Until 1988, he was employed by Dean Stroberg at an hourly wage to do farm work. As David Stroberg's own acreage increased, his income from farm work for Dean Stroberg decreased. By 1989, he received no hourly wages from Dean Stroberg for farm work. He continued to be involved in the operation of Dean Stroberg's farm, as shown by his participation in the wheat harvest activities in June 1989.

Smith considered David Stroberg to be the active manager of Dean Stroberg's farming operation during his employment there.

Three other men who had been employed by Dean Stroberg in his farming operation testified that they regarded David Stroberg as their day-to-day supervisor.

At the time of his injury, Smith's experience in and around farm equipment included operating Dean Stroberg's Massey-Ferguson combine on occasion every summer since 1984. One summer while he was in high school, Smith operated an Allis-Chalmers combine for a custom wheat cutter. At that time, he was trained to do routine servicing of the combine. In junior college, he was enrolled in a curriculum called "Agri-Power & Machinery," which included courses in operation, maintenance, and repair of hydraulic systems, small engines, air-conditioning systems, electrical systems, and farm machinery. He did not consider himself to be a trained mechanic as a result of his studies.

On the day he was injured, Smith was told by David Stroberg to prepare the combine to cut wheat. Smith testified that he greased the machine, started it up, and moved it away from the barn. He parked it, gave it a check inside the cab, and engaged the threshing unit. He climbed down from the cab to oil the chains and make an overall inspection. As he made his first turn around the left end of the header, his right hand was pulled into the pulley. He denied sticking his hand in or near the V-belt or pulley, but he had no explanation for how his hand got caught. Smith testified that the machine was eating away at his hand. At first he tried pulling on his right wrist with his left hand, and then he tried to grab the belt and remove it so he could pull his right hand out. He tried pulling, hitting, and pounding on the belt, and, in the process, his left hand got pulled in several times. In response to Smith's screams, David Stroberg got into the cab and shut off the machine. With the combine off, Stroberg rolled the belt backwards and freed Smith's hands.

Dean Stroberg drove Smith to the emergency room in Hutchinson, and Smith was taken from there to the hospital in Wichita by ambulance. Smith's recollection of the rides and treatment upon arrival is very sketchy. Dean Stroberg testified that on the way to Hutchinson, Smith repeatedly asked, "Why did I do it?" The doctor who saw Smith in the emergency room in Hutchinson

testified that in answer to the question how he was injured, Smith said he was testing a belt on a combine. Smith's record from the hospital in Wichita contains the following history: " 'The patient is a 25 year old white male who, approximately 2:00 p.m. today, pounded his hands against the belt to get it moving on the combine and the belt then took his right hand into it as well as part of his left hand.' "

The orthopedic surgeon who treated Smith testified that Smith suffered serious and painful injuries to his hands, particularly his right hand. During the initial four-hour surgery, tendon lacerations were repaired, skin from his thigh was grafted onto his hand, shattered joints were pinned, and wounds were sutured. He again underwent general anesthesia a few days later in order to have his hands inspected and his dressings changed. At that time, infection had destroyed some of the skin grafts. About a month later, Smith was rehospitalized so that additional skin grafts could be made. On August 21, 1990, he underwent another skin graft and a surgical procedure designed to eliminate some of the contracture of scar tissue between his fingers. In December 1990, the destroyed tendon in his right index finger was replaced with a tendon removed from his foot. The doctor has suggested to Smith that an additional tendon graft and additional surgery for scar contracture be done. He placed Smith's right hand impairment at 38% and the left hand impairment at 2%.

Dr. Knapp, an agricultural engineer who had specialized in farm safety and accident prevention, testified for Smith as an expert witness. He testified that it is common, ordinary, and logical to oil the chains of a combine with the machine running and that he had done so himself. He also testified that part of preparing a combine for harvesting is to start it up "and to conduct a walk-around to make sure that the parts are running the way they're supposed to." He did not believe that Smith had intentionally touched the belt which caught his hand. Among the factors he considered in reaching his opinion was Smith's being left-handed. If Smith had been intentionally touching the belt, he likely would have been doing so with his dominant hand rather than with his right hand. It was Dr. Knapp's opinion that Smith's contact with

the belt was inadvertent and that it occurred because a safety shield was missing.

There was no direct evidence of when or by whom the safety shield had been removed.. Smith's hands were caught in the header part of the combine. The header was changed depending on what crop was being cut. Stroberg testified that Smith worked on the combine before the wheat harvest began on June 19, but Stroberg was the person who changed the reel on the combine the day before Smith's injury. Stroberg also testified that the shield was not replaced until a year after Smith's injury. The shield was in the machine shed before Stroberg replaced it.

Approximately two years after his injury, Smith took some photographs of the interior of the machine shed where several shields from the Massey-Ferguson combine were stored.

We first decide if the district court should have decided as a matter of law whether Smith assumed the risk of his employment rather than submitting the issue to the jury. In *Tuley v. Kansas City Power & Light Co.*, 252 Kan. 205, Syl. ¶¶ 1-7, 843 P.2d 248 (1992), we said:

"The common-law assumption of risk doctrine is restricted to cases involving employer-employee relationships."

"Within its very restricted periphery of application, the common-law defense of assumption of risk has not been altered by the adoption of comparative fault, K.S.A. 1991 Supp. 60-258a, and continues to constitute an absolute bar to recovery."

"Under the doctrine of assumed risk, one who voluntarily exposes oneself . . . to a known or appreciated danger due to the negligence of another may not recover for the injury sustained thereby."

"Assumption of risk arises through an implied contract of assuming the risk of a known danger; the essence of the doctrine is venturousness, and it implies intentional exposure to a known danger."

"In applying assumption of risk principles, the knowledge and appreciation of the risk involved is to be judged by both a subjective standard, *i.e.*, knowledge attributable to the individual plaintiff and his or her situation, and an objective standard, *i.e.*, knowledge attributable to a reasonable person. The plaintiff will be held to comprehend a risk that must have been quite clear and obvious to him or her."

"The assumption of the usual risks of employment is not ordinarily a jury question. It is a matter of law. It is only if the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is

obvious, such as an ordinarily prudent person could appreciate and understand, the worker who persists in the employment assumes the risk."

"It is not knowledge of the actual facts that is determinative in applying assumption of risk; it is knowledge of the risk involved."

*Tuley* presents rather unusual circumstances which were conducive to the entry of summary judgment in favor of the employer. An obvious way in which it differs from other Kansas cases decided on the basis of the doctrine of assumption of risk is that it involved property damage rather than personal injury. Employees of Kansas City Power & Light Co. (KCPL) sued their employer to recover for damage to the finishes of automobiles which they had parked in lots marked with a prominent sign warning of damage to vehicles from airborne materials. The sign concluded with: " 'USE OF THIS LOT IS AT YOUR OWN RISK.' " 252 Kan. at 208. Tuley admitted reading and comprehending the sign, and he testified that every vehicle he had driven to the power plant during his 18-year tenure had been damaged. 252 Kan. at 208. In this respect, too, *Tuley* differs from other Kansas cases where generally whether the danger was known and appreciated is open to question. And there is a third way in which *Tuley* is atypical: It was expressly determined by this court that the employer owed no duty to its employees with regard to furnishing parking. The recitation of the rules of law pertaining to assumption of risk in *Tuley*, therefore, do not reflect some issues which have been raised in the present case, specifically, the employer's duty to provide a safe workplace and when the employee's knowledge of danger is a jury question. In that regard, the court stated the rules of law as follows:

"It is the duty of the master to furnish his servant with a safe place in which to work and with safe and reasonably suitable machinery, tools, implements and appliances with which to perform the work in which the servant is engaged."

"An employee may enter upon the discharge of his labor assuming his employer has performed his duty with respect to the furnishing of reasonably safe tools."

"Assumption of risk by an employee begins after the employer has performed his full duty by providing the workman with safe and reasonably suitable tools, and failure to furnish or provide such will constitute negligence unless the workman knew of the defective condition or could have known of it by reasonable observation." *Fishburn v. International Harvester Co.*, 157 Kan. 43, Syl. ¶¶ 1-3, 138 P.2d 471 (1943).

The court further stated:

"[W]here an employee was injured as a result of having been furnished defective tools and appliances that in such case it cannot be said as a matter of law either the danger was so obvious that the employee must have known of it or that it was so remote the employer could not by chance have had knowledge of it and that both questions were for the jury. [Citation omitted.]" 157 Kan. at 46.

In *Railway Co. v. Quinlan*, 77 Kan. 126, 137, 93 Pac. 632 (1908), the court stated:

"A servant assumes only those hazards which are the natural incidents of the employment. Tools which are dangerously defective are not the natural incidents of any employment. It is the master's absolute and unassignable duty to supply safe ones. If defective tools are furnished the servant may assume the risk attending their use, but he can be held to have done so only when he has knowledge or the equivalent of knowledge of the facts and of the danger."

In the more recent case of *Guerra v. Jaeger*, 204 Kan. 309, 314, 461 P.2d 737 (1969), the court noted that "knowledge of danger, or threatened danger, will not be imputed to a person who fails to look for danger which under the surrounding circumstances he had no reason to apprehend."

This court's infrequent statements of the scope of appellate review include the following: "[A] finding of a jury, supported by evidence, that the master has failed to provide safe tools is conclusive upon review. [Citation omitted.]" *Fishburn*, 157 Kan. at 46. "When the evidence supports a finding of negligence in furnishing a defective tool and does not conclusively show that the injured workman knew or ought to have known of such defect and its probable consequences, a verdict against the employer, approved by the trial court, will not be disturbed." *Steele v. Railway Co.*, 87 Kan. 431, Syl. ¶ 2, 124 Pac. 169 (1912).

Stroberg contends that judgment should have been entered in his favor as a matter of law because the hazard was obvious, especially to someone like Smith who was experienced in the operation and maintenance of the machinery. He relies on *Wilson v. Deer*, 197 Kan. 171, 415 P.2d 289 (1966).

In *Wilson,* this court affirmed the district court's entry of summary judgment in favor of the Deers, who employed Wilson as a farm laborer. Wilson sought to recover for the loss of two fingers

when his hand got caught in a grain auger. The Deers were absolved of negligence because Wilson "assumed the risk of his employment, including the specific hazard of getting his fingers caught in the auger." 197 Kan. at 172. This conclusion was based in large measure on Wilson's own testimony that he knew as much about the operation and risk of the auger as the Deers knew, and he also knew that anything inserted into its open end would be caught. Rather than restate well-established principles, the court referred the reader to previous opinions: *Uhlrig v. Shortt*, 194 Kan. 68, 397 P.2d 321 (1964); *Anderson v. Cooper*, 192 Kan. 723, 391 P.2d 86 (1964); and *Blackmore v. Auer*, 187 Kan. 434, 357 P.2d 765 (1960). 197 Kan. at 172.

In *Blackmore*, the district court sustained a demurrer to Blackmore's evidence, and this court affirmed. Blackmore was employed by the Auers as a farmhand. He was directed by Mr. Auer to stand on a flatbed wagon loading and stacking bales while a man on the ground tossed bales onto the wagon and Auer hauled the wagon at approximately four miles per hour behind a tractor. Blackmore testified that the ground was rough and he shouted to Auer to slow down, but they continued at the same speed. Blackmore's hook slipped out of a bale, they hit a bump, and Blackmore fell backward to the ground, breaking his neck. The court determined that Auer was free of any negligence and that Blackmore was not contributorily negligent. The court also concluded that Blackmore assumed the usual risks of his employment. With regard to the doctrine of assumption of risk, the court stated:

"The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. (*Lively v. Railway Co.*, 115 Kan. 784, 225 Pac. 103, and authorities cited therein.)

"The reason for the doctrine of assumption of risk has been stated in *Lively v. Railway Co.*, [115 Kan. at 789], in the following language:

'. . . It is also a part of the doctrine of assumption of risk that a workman's recourse, when called upon to perform a task too heavy or too dangerous for his capacity, is to quit his employment. That sounds harsh, too, but unless the

court is to usurp the functions of the legislature it has no alternative but to declare the law as it is.' " 187 Kan. at 444-45.

In *Anderson*, 192 Kan. 723, the district court entered judgment in favor of Cooper, the employer, and against Anderson, a farm laborer, and this court affirmed. The decision was based on Anderson's having assumed the risk of injury from his own negligence. Anderson's leg was amputated after he unfastened the hood of an ensilage cutter and was thrown into contact with the rotating cutting blades. The court summed up the evidence as follows:

"The blades were completely enclosed. There could be no danger from the blades until the hood was removed, and there was no danger then if the hood was not removed while the blades were rotating. The appellant was well informed of this situation. He was an experienced farm hand some 54 years of age. He had been operating the machine some 'three or four weeks, or more.' He had been warned on numerous occasions not to remove the hood while the blades were rotating. With this knowledge and after numerous warnings that he should not open the hood while the blades were rotating, which warning was also printed on the hood itself, the appellant proceeded to remove the hood without ascertaining whether or not the cutting blades were rotating." 192 Kan. at 729.

The court concluded that "[a] master cannot be held liable where the employee elects to take a reckless and unnecessary risk. [Anderson] would not have been injured had he observed instructions not to remove the hood from the cutting blades until he had determined that they were not revolving." 192 Kan. at 729.

In *Uhlrig*, 194 Kan. 68, the district court entered judgment in favor of Shortt, the owner of the silo in which Uhlrig, a farm laborer employed by Shortt, was injured. This court affirmed. Uhlrig, an experienced farm hand, was inside the silo moving the end of the pipe around so that the ensilage which was being blown through it into the silo was evenly distributed. When the distributor pipe clogged, the ensilage came showering down from the bottomless gooseneck above. This had happened when Uhlrig was injured. He was unable to see because of the showering ensilage. As he made his way to the door, he was hit on the head by the distributor pipe and fell, seriously injuring his right eye. Uhlrig testified that the distributor pipe's clogging was to be expected

and could not be helped. The machine was in good operative condition at the time of the accident. There was no evidence that Shortt had knowledge of any possible hazards that were not fully known to Uhlrig. In these circumstances, the court concluded that there was no evidence of negligence on the part of Shortt and that Uhlrig "assumed the risk of any hazard which existed in connection with his employment." 194 Kan. at 73. The court expressly rejected Uhlrig's contention that there were questions of fact which needed to be determined by the jury and reiterated the rule that assumption of the risk of employment ordinarily is a matter of law rather than a jury question. 194 Kan. at 74.

Neither *Wilson*, 197 Kan. 171, nor any of the three cases it drew on has facts similar to those in the present case. Wilson essentially barred his own recovery for fingers lost when he stuck them into the open end of an auger by testifying that he generally knew as much as his employers about the machine which injured him and he specifically knew that his fingers would be caught if he stuck them into the open end. There also does not appear to have been any contention in *Wilson* that a safety device, which would have prevented Wilson from sticking his fingers into the open end of the auger, had been removed. The court stated that "there was no defect in the auger, hidden or otherwise." 197 Kan. at 172. Smith gave no testimony in the present case which was comparable to Wilson's, and the evidence was that a safety shield had been removed from the header.

In *Blackmore*, Blackmore toppled from a flatbed wagon where he was stacking bales of hay as directed by his employer. His theory of the employer's liability was that the employer had ordered him into a situation of danger. The court rejected the notion that he had been sent into a perilous situation and characterized stacking bales on a flatbed wagon as usual and customary. Smith's theory of Stroberg's liability is not comparable to Blackmore's contention.

In *Anderson*, contrary to numerous warnings, Anderson removed the hood which shielded the rotating blades of an ensilage cutter. There was no danger until he removed the hood. There is no evidence in the present case that Smith created the danger

by removing the safety shield or even that he was aware a shield had been removed.

In *Uhlrig*, because Uhlrig was blinded by ensilage showering down, he hit his head and fell. The court found that the machinery was in good working order and the employer had no more knowledge about the hazard than Uhlrig did. There was, therefore, no evidence of negligence on the employer's part. The evidence in the present case was that a safety shield had been removed from the header, and there was evidence from which the jury could have inferred that Stroberg knew of the condition of the machinery.

Smith contends that it would be contrary to the line of Kansas cases requiring employers to furnish safe tools and machinery to employees if certain questions about assumption of risk were taken from the jury, as Stroberg advocates. Smith cites *Fishburn*, 157 Kan. 43. Fishburn was employed as a mechanic. He was directed to perform work on a vehicle, which included hammering on a bolt. The hammer which he was furnished for the purpose splintered, and Fishburn lost the sight in one eye. The employer had elected out of the provisions of the Workers Compensation Act. Fishburn sued the employer, alleging that the employer had negligently furnished an unsafe tool and that the employer through its agents knew or should have known of the defective condition of the hammer, of its likelihood to throw off metal fragments, and of its likelihood to cause injury. The employer demurred to the petition; the district court overruled the demurrer, and the employer appealed. 157 Kan. at 44-45. This court affirmed, stating:

"It is apparent the appellee's cause of action is predicated upon the doctrine announced by this court on various occasions, that it is the duty of the master to furnish his servant with a safe place in which to work and with safe instruments for the work in which the servant is engaged. (See *Packing Co. v. Sedlack*, 69 Kan. 472, 77 Pac. 102; *Bridge Co. v. Miller*, 71 Kan. 13, 80 Pac. 18; *Atchison, T. & S.F.R. Co. v. Moore*, 29 Kan. 632, 633; *Starkweather v. Dunlap*, 103 Kan. 425, 173 Pac. 1122; *Iron Works v. Green*, 79 Kan. 588, 591, 100 Pac. 482, and *M.K. & T. Rly. Co. v. Young*, 4 Kan. App. 219.)

"In addition it has also been held it is not only the duty of the master to provide for his employees a safe place to work, including structure and sur-

roundings, and safe and reasonably suitable machinery, tools, implements and appliances with which to work, but that the employees may enter upon the discharge of their labor assuming these duties have been performed by the employer. (See *Emporia v. Kowalski*, 66 Kan. 64, 71 Pac. 232; *Railway Co. v. Loosely*, 76 Kan. 103, 113, 90 Pac. 990, and *Buoy v. Milling Co.*, 68 Kan. 436, 75 Pac. 466.)

"Likewise, it has been held that if the master delegates those duties to another such other becomes a vice principal for whose acts the principal is liable. (*Kelley v. Ryus*, 48 Kan. 120, 29 Pac. 144; *Mining Co. v. Robinson*, 67 Kan. 510, 73 Pac. 102; *Carillo v. Construction Co.*, 81 Kan. 823, 827, 106 Pac. 1050, and *Kreigh v. Westinghouse & Co.*, 86 Kan. 838, 122 Pac. 890.)

"It has also been decided the ordinary risks assumed by an employee are those only which occur after due performance by the master of those duties which the law imposes on him. (*Emporia v. Kowalski*, supra, and *Crouch v. Missouri Pac. Rld. Co.*, 124 Kan. 305, 259 Pac. 799.)

"And, it has been held where an employee was injured as a result of having been furnished defective tools and appliances that in such case it cannot be said as a matter of law either the danger was so obvious that the employee must have known of it or that it was so remote the employer could not by chance have had knowledge of it and that both questions were for the jury. (*Smith v. Railroad Co.*, 108 Kan. 151, 194 Pac. 318.) Also that a finding of a jury, supported by evidence, that the master has failed to provide safe tools is conclusive upon review. (*Packing Co. v. Sedlack*, supra.)" 157 Kan. at 45-46.

Smith cites *Harvey v. Palmer*, 179 Kan. 472, 296 P.2d 1053 (1956), for the proposition that disputed facts about a farm laborer's realization and appreciation of the risk require jury determination. Harvey was an experienced farm employee, but he "had not worked around machinery as a mechanic." 179 Kan. at 474. He was directed by his employer, Palmer, to grind corncobs using a grain grinder which was powered by a tractor. The power take-off shaft had a telescoping cover for protective purposes, which the court referred to as a shield. Harvey had experience binding cane with a power take-off shaft with an immovable shield over it, and he also had used the machinery involved in his injury three times while working for Palmer. The first time he used it, the shield was stiff and would not work because it would not expand even though it was bumped with a hammer to jar it apart. Because it would not spread, Harvey and another laborer had used it as a funnel to run the corn back into the granary, and Palmer witnessed the operation. Later, when Harvey told Palmer

that the shield would not spread, Palmer "explained that someone had cut a hand on it, it had been thrown aside and had been lying there collecting dust and moisture until [he] had picked it up and put it in the shed." 179 Kan. at 475. It had not been used since.

Harvey's injuries occurred when the spool became filled with corn husks and he "stepped up on the hitch to jerk the hand clutch on the left side of the tractor, . . . slipped off the hitch, his right hip came in contact with the revolving shaft, [and] his clothing was caught." 179 Kan. at 476. Harvey testified that he knew the shield belonged over the power shaft, but he didn't know the machine was dangerous without it. He stated: " 'If I had any idea that machine would hurt me like it did I would have never touched it.' " 179 Kan. at 476. This court stated:

"[I]f there are disputed facts as to whether a farm hand who had used such types of modern, power-driven apparatus five times during his experience realized and appreciated or knew the danger, it should be a question of fact for the jury to decide and not one for the decision of the court as a matter of law." 179 Kan. at 480.

Thus, the district court's sustaining of Palmer's demurrer to Harvey's evidence was reversed, and the district court was directed to proceed with the trial. 179 Kan. at 481.

Central to the cases cited by both parties is the question whether the injured worker knew and appreciated the risk which produced his injury. The analytical use of the worker's knowledge and appreciation of the risk differs somewhat. In the line of cases favored by Stroberg, little to no emphasis is placed on the employer's duty to furnish a safe workplace and equipment. The line of cases relied on by Smith features the employer's duty.

On the particular question of Smith's knowledge or appreciation of the danger, he cites the following from the line of cases involving tools or machinery furnished by the employer: *Guerra v. Jaeger*, 204 Kan. 309; *Crouch v. Missouri Pac. Rld. Co.*, 124 Kan. 305, 259 Pac. 799 (1927); *Smith v. Railroad Co.*, 108 Kan. 151, 194 Pac. 318 (1920); *Tecza v. Sulzberger & Sons Co.*, 92 Kan. 97, 140 Pac. 105 (1914); and *Steele v. Railway Co.*, 87 Kan. 431.

In *Steele*, this court affirmed the judgment for Steele against his employer, which had furnished a chisel which was worn so that little burs of metal protruded from the striking surface. Steele's eye was destroyed when two slivers of metal lodged in it. The court concluded that Steele

"could rightfully assume that the company would provide him with such tools and equipment as to make it reasonably safe to work there, and while he knew there was danger of chips flying from the rivets or from the tank, or from a sledge or chisel, he was not called upon so to examine such tools in advance as to assure himself that the ordinary hazards incident to the work when performed with proper tools were to be increased by supplying those which were defective.

"Whether under all the circumstances shown he knew or ought to have known the extent and probable effect of the alleged defect in the chisel was a question for the jury to determine from the evidence and not one for the trial court to decide. The record furnishes sufficient basis for different views regarding this very close question and the court below approved the one taken by the jury." 87 Kan. at 437.

In *Tecza*, 92 Kan. 97, Tecza was injured when he fell attempting to shift a vat of hams and brine from its location. A jury found his employer to have been negligent in failing to furnish sufficient light. Tecza had been working in the same conditions for seven years. The employer sought to defeat his recovery on the ground that he had assumed the risk of his employment. This court rejected the employer's arguments for the following reasons:

"In order that a recovery shall be defeated upon that ground the plaintiff must not only have known of the existing conditions—he must also have realized and appreciated the danger that resulted from them. . . . The matter of making the place safe to work in was not his problem. He was not required to take notice of any but the most obvious dangers. But much more than this was required of the employing company. It was under an obligation to consider carefully whether existing conditions involved any unnecessary danger—to use all reasonable care to see that the place was made safe, not only with respect to apparent risks, but also with respect to any that were latent. (*King v. King*, 79 Kan. 584, 100 Pac. 503.) It can not be said as a matter of law either that the danger resulting from insufficient light was so obvious that the plaintiff must have known of it, or that it was so remote that the defendant could not be charged with knowledge of it. Both questions were for the jury." 92 Kan. at 100-01.

In *Smith*, 108 Kan. 151, H.H. Smith was thrown from scaffolding when a board—the needle beam—broke. The law did

not require him to notice any but the most obvious dangers. 108 Kan. at 154. The court stated that

"mere knowledge of the fact that there were knots in the timber would not prevent the plaintiff from recovering. Even an admission of his that he realized some of the dangers would not prove that he realized all of them. [Citation omitted.] If the jury had found that he did discover the presence of knots in the lumber before he went on the scaffold, that finding would not show that he appreciated the danger attending the use of it. Assumption of risk would not apply unless he appreciated the danger attending the use of it." 108 Kan. at 156-57.

In other words, because Smith saw knots in the board did not mean that he realized that it lacked sufficient tensile strength for use as the needle beam in the scaffold. Although the law did not require the worker to further inspect, it was not enough for the employer to suppose the board was all right, because the employer is obligated to eliminate unnecessary dangers, both apparent and latent. 198 Kan. at 154.

The facts of *Crouch*, 124 Kan. 305, and the law applied to those facts were stated succinctly in the court's syllabus:

"A part of the duty of an employee of a railroad company was to carry a long hose to the top of coaches and to put water in openings made in the coaches for that purpose, and while pulling the hose from one coach to another, it broke at a place where it had been spliced and mended by another employed for that purpose and the employee lost his balance and fell to the ground and was severely injured. It was not the duty of the employee to inspect or repair the appliance he was using, and upon the evidence to which a demurrer was sustained, it was held that the evidence tended to show negligence of the company, and that whether the injured employee had knowledge of the defect or would have known of it, was a question for the jury to determine. The evidence in the record is deemed to be sufficient to take the case to the jury upon all of the issues involved." 124 Kan. 305, Syl.

In the body of the opinion, the court quoted *Railway Co. v. Quinlan*, 77 Kan. at 137, for the following principle regarding assumption of risk:

" 'A servant assumes only those hazards which are the natural incidents of the employment. Tools which are dangerously defective are not the natural incidents of any employment. It is the master's absolute and unassignable duty to supply safe ones. If defective tools are furnished the servant may assume the risk attending their use, but he can be held to have done so only when he has knowl-

edge or the equivalent of knowledge of the facts and of the danger.'" *Crouch*, 124 Kan. at 308.

The court concluded that the case should have been submitted to the jury, and the district court's sustaining of the employer's demurrer was reversed.

In *Mechtley v. Price*, 217 Kan. 344, 348, 536 P.2d 1385 (1975), the court stated: "It should be noted the knowledge and appreciation of the risk involved is to be judged by a subjective standard, by knowledge attributable to the individual plaintiff and his situation (Prosser, Law of Torts, 4th ed., 1971, § 68, p. 447)." In *Borth v. Borth*, 221 Kan. 494, 499-500, 561 P.2d 408 (1977), the court added:

"However, we should note that Prosser goes on to say that:

'. . . [A] purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and the standard applied in fact does not differ greatly from that of the reasonable man. The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him. . . .' Prosser, Law of Torts, 4th ed., 1971, § 68, p. 448."

The remarks in *Mechtley* and *Borth* were quoted in *Jackson v. City of Kansas City*, 235 Kan. 278, 302-03, 680 P.2d 877 (1984), and *Tuley v. Kansas City Power & Light Co.*, 252 Kan. 205, Syl. ¶ 5, 843 P.2d 248 (1992). In arguing that the district court should have ruled that Smith assumed the risk of his employment, Stroberg places special emphasis on Smith's junior college course work and experience as a farm hand. Stroberg's evidence tending to show knowledge attributable to Smith was not undisputed, however. Smith presented evidence which tended to downplay his experience and knowledge. The question whether Smith was aware of and appreciated the risk posed by the unshielded belt, in fact, was at the heart of the evidence and was hotly contested. Stroberg presented evidence of Smith's educational training and work experience from which it could be inferred that Smith should have had a highly developed appreciation of the hazard. Smith's testimony, while allowing his general appreciation of risks posed by large, powerful farm machines, denied appreciation of

the specific injury-producing hazard. It was undisputed that the safety shield was not in place over the area of the combine where Smith's hands were caught, but there were questions of how and why and whether Smith realized the shield was missing. In addition, the evidence tending to show what actions of Smith resulted in the injury was subject to widely varying interpretations. Stroberg's evidence tended to show that Smith purposefully reached into the area where his hands were caught. Smith's evidence tended to show that his injurious encounter was inadvertent.

The Kansas authorities cited by the parties indicate that an injured worker's assumption of risk may be decided by the trial court as a matter of law where the danger is neither "usual" nor patent. As Stroberg contends, there are Kansas authorities which declare that whether a worker assumed the risk ordinarily is not a question for the jury. See, *e.g., Lively v. Railway Co.*, 115 Kan. 784, 788, 225 Pac. 103 (1924). As Smith contends, there also are Kansas authorities which declare that whether a worker knew or ought to have known of the danger and appreciated its consequences ordinarily is a question for the jury. See, *e.g., Steele*, 87 Kan. at 437. The authorities tend to split along the line between industrial and agricultural settings, with the emphasis in the former on the duty of the employer to furnish a safe workplace and equipment.

An annotation entitled "Master's Liability to Servant Injured by Farm Machinery," at 67 A.L.R.2d 1120, was occasioned by increased litigation relating to injuries suffered by farm laborers as farming operations have become increasingly mechanized. See Annot., 67 A.L.R.2d 1124. There, it is stated:

"It has been stated generally that a farm employee, before he may be treated as assuming the risks of his employment, must (or reasonably should) have been aware of the dangers involved and, in addition, must (or reasonably should) have appreciated the danger and risk connected with the defective conditions leading to his injury; and that in case of any doubt the question is ordinarily one for the jury." Annot., 67 A.L.R.2d at 1142-44.

Neither *Jackson* nor *Tuley*, cases involving the defense of assumption of risk which have been decided since the adoption of

comparative negligence, involves agricultural pursuits. *Jackson* arose out of the collision of two fire trucks. This court affirmed the district court's refusal "to rule, as a matter of law, the risk of collision between the two fire trucks was a risk assumed by the claimant firemen in their employment." 235 Kan. at 294. On this topic, the court stated:

> "A collision between two fire trucks on emergency runs is, fortunately, a rare occurrence. We do not believe such a collision could be considered, as a matter of law, a usual risk of a fireman's employment. See generally Annot., Liability for Personal Injury or Damage from Operation of Fire Department Vehicle, 82 A.L.R.2d 312. Additionally, serious allegations were being made (and later established to the jury's satisfaction) of the City's own negligence. We conclude the trial court did not err in refusing to rule, as a matter of law, the firemen had assumed the risk herein involved." 235 Kan. at 295.

*Tuley*, as previously noted, seems to be limited in precedential value due to its unusual circumstances. Principal among them was the absence of any duty on the part of the employer. See 252 Kan. at 215. The employer had no duty to furnish parking to its employees, and by furnishing parking the employer was found not to have assumed a duty to furnish parking facilities which would protect vehicles from airborne caustic compounds. 252 Kan. at 215-16. Thus, as a matter of law, the employees could not recover for a breach of KCPL's duty because no duty existed. This court's affirmance of the district court's entry of summary judgment in favor of the employer need not have reached the question of the employees' assumption of risk.

In the present case, the district court, using PIK Civ. 2d 7.21, instructed the jury that Smith's employer owed a duty to furnish him with safe equipment. Stroberg did not object at trial. On appeal, he has presented no authority which supports the proposition that this duty is not owed. This court's task, therefore, is to consider whether the danger posed by the shield having been removed from the header was so obvious that Smith (or an ordinarily prudent person) must have known of it and whether he (or the ordinarily prudent person) must have appreciated the danger attending its use. The evidence in the present case does not conclusively show that Smith knew or ought to have known of

the danger and its consequences. The trial court did not err in submitting the question to the jury.

Stroberg next argues that the instructions could have misled the jurors into considering assumption of risk along with comparison of fault rather than as a separate and complete defense. Stroberg also complains that the verdict form's not containing a separate line or special interrogatories regarding assumption of risk did nothing to correct the inadequate instruction and obscured the jurors' determination of whether Smith assumed the risk of his employment.

Stroberg proposed that the jurors answer four questions before assigning percentages of fault, including the following: "Do you find that Daniel Smith assumed the risk of injury as to this incident . . . that will bar any claims of Daniel Smith against David Stroberg? (answer 'yes' or 'no')." The verdict form actually completed by the jury began with the yes-or-no question, "Do you find any of the parties to be at fault?" It contains no questions about the assumption of risk defense. Stroberg's counsel objected to the verdict form for that reason and advocated use of his proposed form. The district court declined.

Instruction No. 6 stated in part:

"An employee assumes all the ordinary risks of employment known to him or which by the exercise of reasonable care he should have known. Assumption of risk will bar recovery by an employee only as to inherent risks remaining after the employer has performed those duties imposed on him by law. The risk that the employer may be negligent in performing his duty is not one that the employee assumes.

"If a risk though unusual is obvious, such as that which an ordinarily prudent man could appreciate and understand, a workman who persists in the employment assumes that risk. A workman's recourse when called upon to perform a task too strenuous or too dangerous for his capacity is to quit his employment."

This instruction combines the complete texts of PIK Civ. 2d 7.22 and 7.24.

In its summation of the objections made by the parties to the jury instructions, the district court stated that Stroberg's first line of argument was that judgment should be entered in his favor due to Smith's assumption of the risk. When the district court declined to do so, Stroberg argued that this sentence should be

deleted from the instruction: "The risk that the employer may be negligent in performing his duty is not one that the employee assumes."

It is Smith's position that Stroberg's argument is meritless because the instruction and the verdict form "allowed the jury to completely bar [his] recovery." He also argues that Stroberg's counsel "thoroughly explained" in closing argument that recovery could be denied based on assumption of risk. In fact, Stroberg's remarks concentrated on evidence which he urged would lead to the conclusion that Smith knew the danger and assumed it. With regard to the legal consequence of Smith's assuming the risk, Stroberg's counsel made the following two statements: "He assumed the risk by sticking his hand in there and grabbing, pulling, beating. And based on that assumption of risk instruction alone in Number 6, the evidence would require and show and prove a finding of 80, 90, 100 percent fault on his part and barring any recovery." "[E]ven if you assume that the risk was unusual, as that instruction said, it's obvious, which an ordinarily prudent man could appreciate and understand and he persists with it, he's barred." Comparative fault rather than a complete defense seems to be the subject of the first statement. It appears to bear more on Smith's being denied recovery because his fault was greater than that of the defendants than on Smith's being absolutely barred from recovery. The nature of the risk is the focus of the second statement. It does not seem to have been intended by the speaker to be directions to the jurors as to how to apply the principle of assumption of risk in determining liability.

Smith also argues that K.S.A. 60-249 gives the district court judge considerable discretion in submitting special verdicts or general verdicts accompanied by interrogatories. He states that the district court's refusal to submit special questions with the verdict form in the present case was within its discretion and no abuse of that discretion has been shown. He relies in particular on *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 471-72, 819 P.2d 1192 (1991), *cert. denied* 118 L. Ed. 2d 551 (1992). In that case, as here, defendants had requested special questions in the verdict form. The district court's refusal, the defendants

argued, lumped different fraud theories together so that the jurors did not have to distinguish among them and the appellate court could not. This court stated: "We have reviewed the verdict form and the instructions submitted to the jury, and we find the trial judge properly instructed the jury as to the law and to the application of each theory of fraud against a particular defendant." 249 Kan. at 472. Thus, no abuse of discretion was found. As Smith contends, *Anderson* stands for the proposition that this court will not reverse the district court's refusal to submit special questions in the verdict form unless an abuse of discretion is shown.

Stroberg points out that in *Jackson,* 235 Kan. 205, special questions were used regarding assumption of risk. In its opinion, this court reproduced the special questions which were part of the verdict form. Stroberg also points out that at least one treatise assumes the necessity of special questions where an assumption of risk defense has been asserted and supporting evidence has been presented. The following statement appears in the discussion of the relationship of assumption of risk to comparative negligence in Kansas:

"Only in the rare master-servant case does the assumption of risk doctrine apply in Kansas. Because this has been treated in master-servant cases as a separate defense from contributory negligence, it is assumed that a separate interrogatory would have to be submitted to the jury on assumption of risk. If this is answered in the affirmative, the master-servant case plaintiff would lose even though his negligence was less than that of the employer." 57B Am. Jur. 2d, Negligence § 1438, p. 281.

This court's principal reason for maintaining the defense of assumption of risk after the comparative negligence statute had been enacted was based on the line of cases holding that assumption of risk and contributory negligence were separate and independent defenses. See *Jackson,* 235 Kan. at 301-06.

The objection which Stroberg's counsel made to the jury instruction on assumption of risk was to including the last sentence of the first of the paragraphs of the previously quoted Instruction No. 6: "The risk that the employer may be negligent in performing his duty is not one that the employee assumes." Stroberg argues that this issue was considered in *Tuley* and the court held

that the employer's negligence is not a bar to assertion of the assumption of risk defense. Smith counters that the sentence singled out by Stroberg is part of the pattern instruction, PIK Civ. 2d 7.22, and that the instruction was not changed following this court's decision in *Tuley*.

In *Tuley*, this court backed away from an overly general statement which had been made in *Jackson*. In the earlier case, the court stated: "[T]he employer must, in essence, be negligence free as a condition to the successful assertion of the defense of assumption of risk. Therefore, when assumption of risk has been established there is no negligence to be compared between the employer and the injured employee." 235 Kan. at 305. In *Tuley*, the plaintiffs interpreted *Jackson* "to mean a defendant's negligence is an absolute bar to asserting a successful assumption of risk defense." 252 Kan. at 212. Defendant KCPL undermined the interpretation by asking what need it would have of the complete defense of assumption of risk if its freedom from negligence already afforded a complete defense. The court declared that it "did not intend the interpretation the plaintiffs place on the language" from *Jackson*. 252 Kan. at 213.

Stroberg contends that the sentence in the instruction is objectionable because it is contrary to the court's holding in *Tuley*. His view of the comments in *Tuley* is overbroad. In *Tuley*, we stated that the defendant need not be negligence free to assert the defense of assumption of risk. The instruction does not require a defendant to be negligence free, either. It reflects the holding in many Kansas cases, all of which remain good law, that it is the employer's absolute duty to furnish a safe workplace and equipment. See, *e.g.*, *Crouch*, 124 Kan. at 308; *Tecza*, 92 Kan. at 101; *Quinlan*, 77 Kan. at 137. The rule is simply that an employer has the duty not to expose his employees to perils which the employer may guard against by the exercise of reasonable care.

In any event, we fail to see how the exclusion of the sentence would have improved the suitability of the instruction for informing the jurors how to incorporate the defense into their deliberations. That, after all, is Stroberg's chief complaint with respect to the verdict form and instructions.

The jury was not instructed to consider whether Smith assumed the risk of his employment as a matter separate from comparative fault. Nor was it explained to the jury that its determining that Smith assumed the risk would produce the same result as its finding him 50% or more at fault. The jurors were instructed, however, that assumption of risk may bar recovery. Although the instruction is oblique, under the circumstances of this case, where Stroberg's only objection was to one unrelated and unobjectionable sentence in the instruction, we cannot say that there was reversible error. With regard to the verdict form, Stroberg has not shown an abuse of the district court's discretion.

We next consider if the jury was correctly instructed about Stroberg's duty to Smith. The district court instructed the jurors about assumption of risk as a part of an instruction which begins by stating the duty of an employer to an employee:

"An employer has a duty not to expose the employee in the discharge of his employment to perils and dangers against which the employer can guard by the exercise of reasonable care. He has a duty to warn the employee of hazardous conditions that he cannot guard against by the exercise of reasonable care. It is also the employer's duty to provide safe and suitable machinery, tools, and implements to work with and a safe place to work. This includes the duty to exercise reasonable care in furnishing such appliances, and in keeping them in repair and in making inspections and tests.

"An employee may enter upon the discharge of his labor, assuming that these duties have been discharged by the employer."

This instruction is PIK Civ. 2d 7.21. The jurors also were instructed:

"A supervisor of employees or a farm manager is a person who by agreement with the owner performs or is to perform such services for the owner, with or without compensation. The agreement may be written, oral or implied by the behavior of the parties.

"Under Kansas law, if David Stroberg undertook gratuitously or for some compensation, to carry out services for Dean Stroberg, David Stroberg was under a duty to carry out those services with reasonable care. If David Stroberg undertook, gratuitously or for some compensation, to carry out duties owed by Dean Stroberg as employer, to employee Dan Smith, David Stroberg was under a duty to carry out that undertaking with reasonable care and without negligence."

Stroberg objected to the instruction and argues that he owed no duty to Smith which could serve as the basis for liability. Stro-

berg concedes that the employer has a duty to provide a safe workplace, but he argues that the duty is nondelegable. It appears that what Stroberg sees to be the effect of nondelegability of the duty to provide a safe workplace is that only Dean Stroberg could owe Smith the duty. Stroberg's argument concludes that because he owes no duty to Smith, he cannot have breached a duty.

This court has explained that what is prohibited is the delegation of ultimate responsibility, not the delegation of the task. The one who assumes performance of the task assumes as well the burden of performing the task satisfactorily. Thus, although the party holding ultimate responsibility may not escape liability by delegating the task, neither may the task performer escape liability on the ground that ultimate responsibility lies with another. The trier of fact may apportion their fault.

For example, in *Trout v. Koss Constr. Co.*, 240 Kan. 86, 727 P.2d 450 (1986), a driver injured in a highway accident sued the Kansas Department of Transportation (KDOT) and the contractor who had been engaged by KDOT to perform work on the road. The jury assigned 25% fault to KDOT; on appeal, KDOT argued that it had delegated its duty to keep the highway in reasonably safe condition to the independent contractor. The court rejected the contention that the state agency, by engaging the contractor to perform work on a highway, relieved itself of responsibility for injuries arising from the negligence of the contractor. 240 Kan. at 93. At the same time, the court noted that the independent contractor bears "much of the burden for maintaining the construction site in a manner allowing the safe and satisfactory movement of traffic through the construction area is placed upon the contractor." 240 Kan. at 94.

Stroberg cited *A.T.& S.F. Rld. Co. v. McKee*, 37 Kan. 592, 15 Pac. 484 (1887), for the proposition that "negligence attributable to the superintendent created liability in the principal and not the superintendent." He quotes the following:

"This defendant (the railroad company) had assigned to Mr. Cook and his assistant, Mr. Young, the duty of inspecting the machinery and providing new when necessary, and seeing to it that such machinery was kept in a suitable condition. While so engaged about furnishing and repairing the tools and ma-

chines in the car shop, we believe they were standing in the place of principal to this plaintiff, rather than his fellow-servants. [Citations omitted.]" 37 Kan. at 601.

The contention which the court was refuting with this statement was that the railroad company could not be held liable for the negligence of McKee's fellow servants. McKee did not seek to recover from Cook or Young, and the court did not consider the question whether the supervisor could be held personally liable. *McKee* does not stand for the proposition for which Stroberg cited it, and its teaching is contrary to his portrayal of nondelegable duties. It is a typical case in which the employer is not a person, except in legal fiction, so that the employer's duties are performed by a person occupying a supervisory capacity who stands in the shoes of the employer.

Stroberg relies heavily on cases from other states in support of his contention that "[a]n action cannot be maintained against supervisors merely for failing to carry out the employer's duty of providing a safe workplace." *Kruse v. Schieve*, 61 Wis. 2d 421, 427-28, 213 N.W.2d 64 (1973), in particular, is relied upon by Stroberg. That case was a third-party action by an injured worker who had received workers compensation benefits against an individual alleging that he was an employee and a corporate officer. It involved questions of the liability of a corporate officer after payment of workers compensation and whether he was acting in that capacity and whether the capacities could be isolated where the theories had been commingled. It cannot be said either to stand for Stroberg's contention or to assist his cause in other or more general ways.

The only Kansas case cited by Stroberg as supporting his proposed instruction about a supervisor's role is *Allen v. Shell Petroleum Corp.*, 146 Kan. 67, 68 P.2d 651 (1937). We fail to see how this case relates to his proposed statement of the law. It was "concerned only with the judgment against the principal defendant." *Allen*, 146 Kan. at 67. The court stated: "The real question at issue in this case was what was the nature of the fumes and gases dispelled from the oil at this refinery at which plaintiff claimed to have been injured, and should defendant have known

they would be injurious to plaintiff and hence required warning of that fact other than that which was given?" 146 Kan. at 74. Because "the evidence disclosed the fumes and gases were not inherently poisonous" and "nonpoisonous substances did not exist in dangerous quantities," the court concluded that Shell was not negligent in not warning Allen. 146 Kan. at 77.

Stroberg also argues that the second paragraph of the district court's instruction about his duties was not supported by the evidence. He states that the instruction was based on § 324A of Restatement (Second) of Torts (1965), which is premised on the defendant's undertaking to render services to another. Thus, there should have been evidence from which the jury could have found that Stroberg agreed to render services. There was ample evidence of his compensated and uncompensated participation in Dean Stroberg's farming operations from which the jurors could have found that he had undertaken the rendering of services.

We next consider the jury award of $39,138 for medical expenses to date and $35,000 for future medical expenses. Stroberg argues that the award for future medical expenses was excessive. He also contends that, being the result of passion and prejudice, the infirmity in the future medical expenses award permeated the entire verdict, thus necessitating a new trial. His argument, however, was based solely on the size of the award. In these circumstances, the test applied by this court is whether the amount of the jury award shocks the court's conscience. See *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1032, 850 P.2d 773 (1993). The determination for each case depends on its own facts. 252 Kan. at 1032. Thus, the answer lies in a comparison of Smith's evidence of future medical expenses with the jury's award for that item of damages.

Stroberg relies on *Morris v. Francisco*, 238 Kan. 71, 78-79, 708 P.2d 498 (1985), for several propositions. First, an objective element of damages, such as future medical expenses, must have evidentiary support. Second, an appellate court's function includes reviewing the record to see if there is evidence to support the jury's calculation of pecuniary loss. The evidence must be reviewed in the light most favorable to Smith, who prevailed in the

district court. See *Ratterree v. Bartlett,* 238 Kan. 11, Syl. ¶ 11, 707 P.2d 1063 (1985).

In large measure, the evidentiary basis for the jury's calculation of future medical expenses was medical expenses to date. Smith's medical expenses before trial included two surgical procedures— a tendon graft and a procedure to eliminate scar contracture, performed on December 26, 1990, and August 21, 1990, respectively. Smith's treating physician, Dr. George Lucas, testified that these procedures likely would need to be repeated in the future. Dr. Lucas testified that Smith's medical expenses related to these procedures would be comparable to those incurred for the procedures already performed.

The medical center's charge for the first tendon graft was $3,668.35, and for the first scar contracture procedure it was $3,023.75. The anesthetist's charge for the scar contracture procedure was $671.50. There is no evidence of anesthesia charges for the tendon graft.

Dr. Lucas testified that Smith would be under his care indefinitely and that Smith currently visited his office several times a year. Dr. Lucas testified that his current office charges ranged from $27 to $35. Medical records were admitted into evidence showing actual charges of up to $48 for office visits.

Dr. Lucas also testified that there is post-traumatic arthritis present in Smith's hand which likely will become more troublesome with time and may require medication or treatment. No estimate of cost was provided. Smith urges that the general range of costs for medication which may be found in his medical records provides an adequate basis upon which the jury might have estimated future expenses.

The other expense which Smith claims he may incur would be for physical therapy. Smith was billed for physical therapy as a part of his initial hospitalization in June 1989, but the evidence does not show that he underwent physical therapy after the scar contracture procedure in August 1990 or the tendon graft in December 1990. In fact, the bills for whirlpool baths and exercise sessions show that he consistently and regularly received these treatments up to the time of the scar contracture procedure but

not after that date. The charge for his last exercise session in August 1990 was $25.25. Dr. Lucas testified that Smith might need four to six weeks of physical therapy following a tendon graft. In his brief, Stroberg suggests that any damages based on this testimony be calculated using two therapy sessions per week. At $25.25 per session, therapy for six weeks would total $303.

The only other evidence concerning the possibility of future physical therapy appeared almost incidentally in Dr. Lucas' testimony. He was asked to characterize Smith as a patient:

"[H]e's a faithful patient; faithful in terms of showing up for his appointments, taking his medicine, wearing his splints, doing his exercises; . . .

"Q. By exercise, you're referring to what?

"A. Well, exercising in this case his hands, of course; doing not only active exercising, moving his hands, but also stretching them, having his wife or a therapist stretch the joints, and wearing the splints for the purpose of stretching the joints.

"Q. This is done at home?

"A. Yes.

"Q. Outside the confines of professional physical therapists or anyone like that?

"A. Yes.

"Q. Okay. Is this something—these home exercises, is this something that Dan Smith—how long would he have to do these?

"A. Forever."

Smith contends that he is entitled to have a professional therapist, rather than his wife, stretch his finger joints. Based on the $25.25 per session charge and therapy approximately once a week for his 46-year life expectancy, Smith contends that the evidence would support an award of more than $46,000 for future therapy.

Smith also contends that the jury properly could have considered the impact inflation might have on future medical costs. For this proposition, he relies on the following: "The jury may consider the impact inflation may have on the future cost of medications necessary to treat a medical condition arising out of an injury. Expert testimony is not necessary to establish the impact of inflation." *Tamplin v. Star Lumber & Supply Co.*, 16 Kan. App. 2d 352, Syl. ¶ 5, 824 P.2d 219 (1991), *aff'd as modified* 251 Kan. 300, 836 P.2d 1102 (1992). Expert testimony may not be necessary but some evidence of the impact of inflation is. In *Tamplin*,

the injured child was required to take twice-daily doses of a hormone replacement for life. Her mother testified about the drug's price increase of more than 20% over a 33-month interval. 16 Kan. App. 2d at 363. In the present case, Smith has not brought to the court's attention any similar evidence of the impact of inflation.

In summary, there is solid evidence that Smith may expect to incur expenses of $3,668 for a future tendon graft, $3,023 for a future scar contracture procedure, and at least $671 for anesthesia. There is evidence that he will continue under Dr. Lucas' care indefinitely and incur expenses for office visits. Based on the evidence, the jury could have allowed approximately $40 per visit; two visits per year for Smith's 46-year life expectancy would total $3,680. This subtotal is $11,043. In addition, the jurors may have included costs for anesthesia, arthritis medication, and physical therapy. The award of $35,000 does not shock the conscience of the court.

We next consider the jury's award of economic loss to date. The jury awarded Smith $30,000 for economic loss to date.

Smith had two sources of income. His regular income was from Earle Smith Carpets, and he earned part-time wages from Dean Stroberg.

Smith's gross quarterly income from the carpet company from January 1987 to September 1992 is shown as follows:

| 1987 | 1988 | 1989 | 1990 | 1991 | 1992 |
|------|------|------|------|------|------|
| 2,306 | 3,679 | 7,632 | 5,073 | 4,728 | 4,312 |
| 3,658 | 4,611 | 6,597 | 5,265 | 4,482 | 5,294 |
| 3,265 | 4,181 | 2,216 | 5,615 | 4,266 | 5,740 |
| 4,765 | 5,549 | 3,894 | 4,652 | 4,445 | |

On the basis of this evidence, Stroberg argues that Smith's economic loss from carpet work was less than $4,000 from the date of injury to trial. Smith argues that the same evidence supports the jury's award. The difference in their calculations lies primarily in Stroberg's averaging quarterly income and Smith's using income immediately prior to his injury.

Smith's injury occurred on June 19, 1989, and trial took place in January and February 1993. The evidence shows that in the

two quarters immediately before his injury, Smith was earning more than he ever had from the carpet company and that his income had risen fairly steadily during the previous two years to the high level of the first half of 1989. Smith contends that but for his injury, his earnings at least would have remained at the high level of the first half of 1989. He computes his economic loss, therefore, on that basis.

Smith uses the $7,632 figure as representative of both quarters of the first half of 1989. He justifies it on the ground that his injury occurred with approximately a week and a half left in June, when his weekly earnings were approximately $550, ($6,597 divided by 12 = $549. 75). At $550 per week times 13 weeks for the quarter, his second-quarter earnings would have been $7,150. Smith raises some question about what he could have earned in the second quarter of 1989 by stating, "if not for his vacation or his injury," he would have earned $7,600. He was on vacation from his job at the carpet company at the time he was injured; he does not state whether or not it was paid vacation leave.

Smith's total carpet company income for the period from July 1, 1989, through September 1992 was $59,982. There were 13 quarters during that period. If Smith had been earning $7,600 per quarter, he would have earned $98,800. The difference between the two figures is $38,818. If Smith had been earning $7,150 per quarter, he would have earned $92,950. The difference between the two figures is $32,968.

Stroberg's computation is based on an average per quarter figure for the nine quarters from April 1, 1987, through June 1989. Stroberg calculates that figure at $4,881. He then multiplies $4,881 by 13 quarters to get the figure of $63,453 as Smith's projected earnings for the 13 quarters following his injury at his average earnings level during the preceding nine quarters. Stroberg subtracts $59,982, Smith's actual earnings during the 13 quarters following his injury, from the $63,453 figure for a difference of $3,471. Stroberg argues, therefore, that the jury's award of $30,000 is unreasonable.

Stroberg cites no authority for the proposition that the income level achieved by a worker at the time of his injury should not

be the income level upon which income loss following the injury is computed. He asserts that Smith's quarterly earnings were "up and down" during the two and a half years before the injury, and this seems to be his rationale for averaging the quarterly figures. In fact, the figures show only minor fluctuations within an unmistakable upward trend. It may also be noted that Stroberg concedes that Smith lost approximately $6,000 in earnings from part-time work for Dean Stroberg. We do not find any excessiveness to this verdict which might shock the conscience of the court.

Finally, as to damages, does the jury's award of future economic loss shock the court's conscience? The jury awarded Smith $370,000 for future economic loss. Stroberg contends that "at most, there is $1,000.00 or $2,000.00 per year difference" between Smith's pre- and post-injury earnings. Smith was 28 at the time of the trial and could expect to work an additional 37 years before retiring. Stroberg's projection, therefore, would be future economic loss ranging from $37,000 to $74,000. His figures are derived more or less from the quarterly averages discussed with regard to Stroberg's arguments on economic loss to date. He uses the average quarterly pre-injury earning of $4,881 and multiplies it by four for an annual income of $19,524. He then adds the four quarters' earned income for 1991 for an annual post-injury income of $17,921. He subtracts $17,921 from $19,524 and rounds off the result, $1,603, to $1,000 to $2,000.

Smith argues that the award was the jury's estimation of the amount of damages he should recover for the diminution of his earning capacity. See *Morris v. Francisco*, 238 Kan. at 78-79. The award, therefore, should be based on a comparison of what he will be capable of earning in the future with what he earned before the injury. See 238 Kan. at 79.

Smith advocates that his pre-injury earning capacity is reflected in the income level reached immediately before his injury. Again, he argues that $7,600 per quarter is an appropriate figure. As indicated in the discussion of the previous issue, his earnings in the first quarter of 1989 were $7,632, and it appeared that he would have earned approximately $7,150 if he had worked the full second quarter of 1989. At $7,600 per quarter, Smith's pre-

injury annual income would have been $30,400; at $7,150 per quarter, it would have been $28,600. In the first full year after his injury, Smith's carpet company earnings were $20,605; in the second year they were $17,921. If the earnings from the first three quarters of 1992 are averaged and multiplied by four, the estimated income for 1992 totals $20,460. The average for 1992 through 1994 is $19,662. $19,662 subtracted from $30,400 equals $10,738; $19,662 subtracted from $28,600 equals $8,938. It is Smith's contention, therefore, that the jury could have figured that his earning capacity had diminished by $10,000 per year, and, in his 37 years of expected employment, he would lose $370,000. Using the $8,938 figure, he would lose $330,706.

In addition to a straight comparison of his pre- and post-injury carpet company earnings, Smith urges the court to consider evidence of several other factors which support the jury's assessment. There was evidence that post-traumatic arthritis will worsen with time and further diminish the function in his right hand. There was evidence that Smith's father, who owned the carpet company for which he worked, had been quite generous in compensating Smith in the several years following his injury. The inference he would like the court to draw is that such generosity, or "special treatment," could not be expected to continue for the indefinite future. In this regard, Stroberg calls to the court's attention some evidence of a worsened economic climate and decreased carpet sales for the carpet company in the several years following Smith's injury. Smith counters that the carpet company increased prices, laid off workers, and added a carpet cleaning service to balance revenue lost from declining sales. Reviewing the evidence in the light most favorable to Smith, we conclude there is ample evidence to support the award. The jury award for future economic loss does not shock the conscience of the court.

Stroberg next contends that the district court erred in admitting photographs of unused safety devices and shields hanging inside the machine shed of Dean Stroberg. Stroberg's motion in limine seeking exclusion of the photographs was denied. When the photographs were introduced at trial, Stroberg's counsel stated, "I'd raise the same objections as the motion *in limine*." Smith does

not complain about the form in which the contemporaneous objection was made. The photographs were admitted. Stroberg claims that their admission was highly prejudicial and warrants this court's granting a new trial. For this remedy, he relies on *Schroth v. Bardrick*, 106 Kan. 154, 156, 186 Pac. 749 (1920).

K.S.A. 60-261 provides that an error in the admission of evidence is not a ground for granting a new trial unless it affected the substantial rights of the parties. It also is well settled that

"[a] trial court's decision concerning the admissibility of evidence will not be disturbed on appeal absent a showing of abuse of discretion. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11, 815 P.2d 528 (1991); see *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991). 'An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court.' *Enlow*, 249 Kan. 732, Syl. ¶ 9. This general principle applies to rulings on the relevancy of evidence. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967)." *City of Olathe v. Stott*, 253 Kan. 687, 700, 861 P.2d 1287 (1993).

Stroberg's argument seems to be, first, that the photographs were not relevant. He argues that they did not tend to prove or disprove any controverted matter because they were taken after the injury and there was no evidence to show that they depicted the way the shed interior looked at the time of the injury. He also argues that they lack relevance because he neither owned the devices nor placed them where they were photographed. Second, he seems to argue that, even if the photographs were relevant evidence, the district court should have excluded them as being more prejudicial than probative. In this regard, he cites K.S.A. 60-445 and several cases, including *Ratterree v. Bartlett*, 238 Kan. at 17-18. He, however, does not explain how the rule might have been applied in this case.

Smith contends that the photographs are relevant for the purpose of showing that on more than one occasion, safety devices and shields had been removed from a combine and other machinery on Dean Stroberg's farm and hung in the shed. With regard to Stroberg's knowledge of the practice, Smith cites the testimony of Dean Stroberg that his son was "in and out" of the machine shed "all the time." He also brings to the court's atten-

tion the following portions of Stroberg's testimony about the photographs:

"Q. And Exhibit 2(b), that's inside your father's barn, isn't it?

"A. Uh-huh.

"Q. Now, have you identified before some of these red items hanging up here as shields?

"A. Yes, I did.

"Q. And I think you have indicated they are shields belonging on the Massey-Ferguson combine.

"A. Yes.

. . . .

"Q. And the item down here in the corner, that's a roll bar off a tractor, isn't it?

"A. Yes.

"Q. And who put—who took that roll bar off the tractor?

"A. I believe either dad or I did.

"Q. Either you or your father; right?

"A. Yes.

"Q. Okay. Who put the roll bar in the barn?

"A. Probably either one of us.

"Q. It's—it could have been you that put that in the barn; right?

"A. Possibly, yes.

"Q. Could it have been you that put the shields in the barn?

"A. Well, that's kinda interesting.

"Q. Could it have been you?

"A. I don't believe so.

. . . .

"Q. Mr. Kelly asked you about the items in the shed, and I think it's your testimony that you didn't put the shields in there; is that correct?

"A. That's right.

"Q. Didn't you on occasion take parts off of Dean's equipment and put it in the barn?

"A. To work on it, yes.

"Q. And you had worked on your father's equipment; correct?

"A. At times, yes.

"Q. You worked on his tractors.

"A. Yes, at times.

"Q. You worked on his combines.

"A. Yes.

"Q. And did you not only take things in there to work on it but store things in his barn store, parts in his barn?

"A. Probably new parts, things like that, yes."

With regard to whether the interior of the machine shed looked

at the time of the injury as it appears in the photographs, Smith introduced the testimony of Craig Harden, who worked on the Stroberg farm from 1986 to 1988, prior to Smith's being injured. He testified that he could not be certain that the safety shields were hanging in the machine shed when he worked there. He added, "but I think they probably were." Smith testified that he took the photographs more than two years after his injury occurred.

Stroberg has not satisfied his burden of establishing that the district court abused its discretion in the admission of the photographs. It was clear to the jury that the photographs depicted the machine shed two years after Smith's injury. The jury also heard evidence that the shield which was missing from the combine at the time of the injury was replaced on the combine about a year later. The defendants could have requested that the photographs be admitted on a limited basis and asked the court to so instruct the jury, but no request to that effect has been brought to this court's attention. K.S.A. 60-406 provides that "the judge *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) We find no reversible error in the admission of the photographs into evidence.

We next consider if the settlement agreement between Smith and Dean Stroberg should have been disclosed to the jury. Smith filed a motion in limine to prevent disclosure to the jury of the terms and conditions of his settlement with Dean Stroberg. Stroberg opposed the motion and requested that the jury be instructed that Smith had sued Dean Stroberg and settled with him. The district court ruled that the settlement between Smith and Dean Stroberg was not admissible in evidence, and it granted Smith's motion.

After voir dire, Smith and Massey-Ferguson settled, and the newly selected jury was advised of that settlement. At that time, Stroberg renewed his request that the jury be advised of Smith's settlement with Dean Stroberg, and the request was denied.

In closing argument, Stroberg's counsel referred early and often to Smith's settlement with Massey-Ferguson. The last of these references came on the heels of recounting Smith's contentions

against Dean Stroberg. Immediately following Stroberg's listing of the contentions against Dean Stroberg, he stated: "Remember whose ox is getting gored. At that time, he was after Dean. Then he was after Massey-Ferguson. It was all their fault. Well, he settled with them. He's got their money. Now he's after us."

Smith contends that with these remarks, Stroberg violated the district court's order prohibiting disclosure of the Dean Stroberg/Smith settlement to the jury. Stroberg denies the contention. He stated, " 'Well, he settled with them. He's got their money' obviously refers to former Defendant Massey-Ferguson, Inc. who was the last entity mentioned in the sentence most directly prior to those comments." Examination of Stroberg's counsel's closing argument shows that he tended to use a third-person plural pronoun when the singular would have been appropriate. Thus, it is possible that he intended to refer only to Massey-Ferguson. Even if it was Stroberg's counsel's intention to refer to settlement with Massey-Ferguson only, listeners, including the jurors and Smith's counsel, could and probably would have given his words their standard meaning rather than construing them according to his idiosyncratic use. Hence, listeners probably interpreted his remarks to mean that Smith had settled with both Dean Stroberg and Massey-Ferguson.

During the rebuttal portion of his closing argument, Smith's counsel stated: "He said we made some contentions against Dean Stroberg and now we're coming in saying he's old and he didn't have much to do with it. He's exactly right. That's one of the reasons Dean is let out of the case." Stroberg contends that with these remarks Smith's counsel necessitated disclosure of the settlement to the jury. He contends that the remarks were misleading in that Dean Stroberg paid to get out of the case rather than being let out due to his age and infirmity. Smith's counsel contends that his remarks were accurate and simply in response to the remarks of Stroberg's counsel, which had opened the door. The district court denied Stroberg's motion for a mistrial based on Smith's counsel's rebuttal remarks.

On appeal, Stroberg relies on *Ratterree*, 238 Kan. 11, and *Lytle v. Stearns*, 250 Kan. 783, 830 P.2d 1197 (1992). In *Ratterree*,

"there was a secret settlement on the eve of the trial. Appellants moved for discovery of that settlement in order to determine whether it might be a 'Mary Carter' agreement and possibly thereby objectionable." 238 Kan. at 26. The request was denied. On appeal, it was argued that failure to make the settlement known to the jury diminished its "ability to analyze the true posture of the parties and the weight and credibility to be given to the testimony of the witnesses, since the jurors were unaware that one of the 'defendants' had an actual financial interest in [Ratterree's] obtaining a large verdict against the other defendant." 238 Kan. at 26. Appellants contended that Ratterree and the settling defendant "agreed in their settlement that any money recovered by Ratterree from appellants over and above $150,000 would reduce [the settling defendant's] obligation to Ratterree dollar for dollar regardless of the actual verdict returned against Hernandez." 238 Kan. at 24. In addition, the settling defendant had filed a cross-claim against appellants. 238 Kan. at 29.

The potential for injustice arising from the use of secret settlement agreements prompted this court to adopt the following rule:

"When a settlement agreement is entered into between the plaintiff and one or more, but not all, alleged defendant tortfeasors, the parties entering into such agreement shall promptly inform the court in which the action is pending and the other parties to the action of the existence of the agreement and its terms. If the action is tried to a jury and a defendant who is a party to the agreement is a witness, the court shall, upon motion of a party, disclose the existence and content of the agreement to the jury unless the court finds in its discretion such disclosure to the jury will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." 238 Kan. at 29.

In *Lytle*, the court was "called upon to review the application of our rule established in *Ratterree.*" 250 Kan. at 784. The complaint on appeal was that settlement information had been submitted to the jury rather than withheld. Deborah Lytle was injured in an automobile accident in Miami County. At the scene, Donald Stearns, the owner and operator of an ambulance service, examined Lytle and ordered cancellation of Life Flight, which was en route and within five minutes of arrival at the accident scene. After being taken by Stearns' ambulance to Humana Hospital in

Kansas City, Lytle died from internal bleeding. There was general agreement among expert witnesses that she "could have been saved if she had received definitive care sooner." 250 Kan. at 787.

The victim's parents sued a number of defendants on various theories. Before trial, they settled with all defendants except Stearns. The Lytles filed a motion in limine to prohibit Stearns from referring to dismissal of any of the other defendants. The district court denied the motion, but directed that any mention of settlement would be by the court and not the parties. During the course of the trial, the district court ruled that it would advise the jurors of the settlements following the emergency doctor's testimony. The Lytles then advised the district court that "they intended to bring the settlement out on direct examination [of the emergency doctor] without waiving their continuing objection." 250 Kan. at 788.

On appeal, the Lytles argued that the settlement should not have been disclosed, that *Ratterree* applies only to agreements whereby a defendant may reduce an obligation by increasing the liability of one or more codefendants, and that K.S.A. 60-452 and 60-453 prohibit evidence of settlement. This court stated: "The *Ratterree* rule is broad enough to include any confidential settlement in any tort action involving multiple defendants when the settling defendant is a witness and either remains a party to the action or retains some financial interest in the litigation." 250 Kan. at 791. It concluded, however, that the factual circumstances of *Lytle* were not controlled by *Ratterree*. 250 Kan. at 792. This is how the court distinguished the facts of the cases:

"Both *Ratterree* and *Slusher* [*v. Ospital by Ospital*, 777 P.2d 437 (Utah 1989) (adopting the *Ratterree* rule on secret settlement agreements)] involved settlements with defendants who remained in the case to prosecute cross-claims. In the case at bar, Dr. Holmes [the emergency doctor] and Humana did not remain in the case. The Lytles did have an incentive after the settlement to attempt to allocate most, if not all, of the fault on Stearns, the remaining defendant. However, Dr. Holmes and Humana were not joined until after Stearns asked that their fault be compared. The Humana nurses and Dr. Holmes never changed their testimony. They always blamed Stearns." 250 Kan. at 792.

Moreover, the court concluded that neither K.S.A. 60-452 nor 60-453 "squarely applies," but that "[t]he policy behind the stat-

ute—to promote settlement without fear the settlement will be used in evidence against the settling parties—supports the Lytles' position." 250 Kan. at 791.

Stroberg contends that the *Ratterree* rule applies in the present case because Dean Stroberg was a witness "and remained a party in the sense his fault was compared by the jury." He is referring to this court's statement in *Lytle* that the *Ratterree* rule includes cases where a settling defendant is a witness "and either remains a party to the action or retains some financial interest in the litigation." 250 Kan. at 791. Stroberg's reading of this court's statement is too broad. In *Lytle*, this court found that the circumstances did not support application of the *Ratterree* rule, and those circumstances included the emergency room doctor's fault being compared with that of Stearns. 250 Kan. at 787. Thus, we did not consider having fault compared to be the equivalent of remaining a party but, instead, had pending cross-claims in mind when referring to a settling defendant remaining a party. Also, our discussion of whether a party retained some financial interest in the litigation was limited to *Mary Carter* or sliding-scale agreements.

Stroberg argues that he was prejudiced by the district court's refusal to inform the jury of Smith's settlement with Dean Stroberg. The prejudice, he argues, was due to the jury's being "obviously confused as to why Dean Stroberg, who admittedly was the employer of Dan Smith, who was also a witness, who was person whose fault was compared, was not physically present at trial." It appears that he means "on trial" rather than "at trial"; Dean Stroberg testified at trial. Stroberg does not bring anything to the attention of the court which would support his assertion of juror confusion. It appears that by "obviously" he means that one might infer from the circumstances that the jurors would find it curious that Dean Stroberg was not a defendant.

To Stroberg's assertion of prejudice, Smith responds that Stroberg has presented no evidence of confusion or prejudice. He further contends that any prejudice would have been substantially outweighed by permitting Stroberg to use the settlement against him and that such use would have violated the policy of promoting settlement behind K.S.A. 60-452 and 60-453.

Under *Ratterree* and this court's analysis of its application in *Lytle*, the rule may be stated as follows: When a settlement agreement is entered into between the plaintiff and one or more, but not all, alleged defendant tortfeasors, the parties entering into such agreement shall promptly inform the court in which the action is pending and the other parties to the action of the existence of the agreement and its terms. If the action is tried to a jury and a defendant who is a party to the settlement agreement is a witness and either remains a party to the action or retains some financial interest in the litigation, the court shall, upon motion of a party, disclose the existence and content of the agreement to the jury unless the court finds in its discretion such disclosure to the jury will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. See *Lytle*, 250 Kan. at 791-92; *Ratterree*, 238 Kan. at 29. In the present case, Smith entered into a settlement agreement with some but not all alleged defendant tortfeasors, the action was tried to a jury, and Dean Stroberg, who was a party to the settlement agreement, was a witness. Dean Stroberg, however, who was not a cross-claimant or a party to a sliding-scale agreement, neither remained a party to the action nor retained a financial interest in the litigation within the meaning of this court's rule. We find no error in the court's failure to disclose the existence and the terms of the settlement agreement between Smith and Dean Stroberg.

The judgment of the district court is affirmed.